### In re LUKENS INC. SHAREHOLDERS LITIGATION.

#### C.A. No. 16102.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 17, 1999.
Decided: Dec. 1, 1999.

---

Judith Nichols Renzulli, Esquire and Robert J. Valihura, Jr., Esquire (argued), of Duane, Morris & Heckscher, LLP, Wilmington, Delaware; of Counsel: Anthony J. Costantini, Esquire (argued) and Maria Cilenti, Esquire, of Duane, Morris & Heckscher, LLP, New York, New York; Attorneys for Plaintiff Wretha Evelyn Walker.

Irving Morris, Esquire and Karen Morris, Esquire, of Morris & Morris, Wilmington, Delaware; of Counsel: Aaron Brody, Esquire, of Stull, Stull & Brody, New York, New York; Attorneys for Plaintiff Carrie Anne Polonetsky.

Joseph A. Rosenthal, Esquire and Carmella P. Keener, Esquire, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Andrew L. Barroway, Esquire, Marc A. Topaz, Esquire and Gregory M. Castaldo, Esquire (argued), of Shiffrin Craig & Barroway, Bala Cynwyd, Pennsylvania; Attorneys for Plaintiff Michael Abramsky.

Steven J. Rothschild, Esquire, Robert S. Saunders, Esquire (argued) and James L. Love, Esquire, of Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, Delaware; Attorneys for Defendant Lukens Inc. and the Director Defendants.

Charles F. Richards, Jr., Esquire (argued) and Megan S. Greenberg, Esquire, of Richards, Layton & Finger, Wilmington, Delaware; Attorneys for Defendant Bethlehem Steel Corporation.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

On January 5, 1998, Lukens, Inc. ("Lukens" or the "Company") announced that Bethlehem Steel Corporation had agreed to pay $30 per share (consisting of a combination of cash and stock) in exchange for all of the Lukens common stock. This announcement followed an initial agreement between Lukens and Bethlehem to merge at a price of $25 per share and a subsequent proposal from a third party to pay $28 per share. The Lukens stockholders voted to approve the Lukens/Bethlehem transaction, which was consummated on May 29, 1998.

Three stockholder actions were filed in December 1997 and January 1998. I entered an order consolidating them for all purposes in March 1998. At that time, plaintiffs filed a consolidated class action complaint. They amended that pleading on May 26, 1998, only days before the stockholder vote. That complaint alleged breaches of fiduciary duty by the Lukens board of directors (essentially a *Revlon* claim that the directors failed to seek the best value reasonably available for Lukens) and claimed that Bethlehem is liable for aiding and abetting those alleged breaches. That complaint made no claim that the proxy materials sent to stockholders in connection with the proposed merger were false or misleading in any respect. Plaintiffs never sought any form of injunctive relief in connection with the transaction.

In June 1998, the defendants moved to dismiss the complaint. After briefing and oral argument on those motions, I allowed plaintiffs to file the Second Amended and Supplemental Consolidated Class Action complaint (the "Complaint") on May 28, 1999. The defendants then renewed their motions and the parties provided supplemental briefing regarding the matters newly alleged.

The issue presented may be expressed as follows: does a stockholder complaint challenging the conduct of a board of directors in relation to a completed merger transaction state a claim upon which relief may be granted where (i) the complaint does not include any well-pleaded allegations of fact indicating that a majority of the directors were not independent and disinterested or that their actions were taken in bad faith or in breach of their duty of loyalty, (ii) rescission of the trans-

action is unavailable as a matter of law, (iii) the pertinent certificate of incorporation contains a provision, authorized by Section 102(b)(7) of the Delaware General Corporation Law ("DGCL"), protecting the directors from liability for monetary damages for breach of the duty of care, and (iv) the stockholders authorized and approved the transaction on the basis of proxy materials not alleged to be false or misleading in any material respect?

I conclude that the facts alleged in the complaint here at issue, taken as true, do not state a basis upon which I could ever either rescind the transaction or enter an award of money damages against the director defendants. For that reason, I will grant the motion to dismiss the claims against the director defendants. I will also dismiss the claim of aiding and abetting made against Bethlehem as unsupported by the well-pleaded allegations of the Complaint. Finally, I will dismiss the claims against Lukens, as there is no basis alleged on which to recover from Lukens separately from the claim against the director defendants.

## II. BACKGROUND [1]

### A. The Parties

Defendant Lukens, a Delaware corporation, was a holding company whose subsidiaries manufactured various steel products. The ten individual defendants, R. William Van Sant, T. Kevin Dunnigan, Ronald M. Gross, W. Paul Tippett, Michael O. Alexander, David B. Price, Jr., Joab L. Thomas, Rod Dammeyer, Sandra L. Helton and William H. Nelson, III, comprised the Lukens Board of Directors at the time of the merger (the "Director Defendants"). Van Sant was Chairman of the Board and Lukens's CEO and president for the five years preceding the merger. The Complaint does not allege that any of the other Director Defendants was employed by Lukens or was associated with it other than as a director.

Defendant Bethlehem Steel, a Delaware corporation, manufactures and sells a wide variety of steel mill products and produces and sells coal and other raw materials.

Plaintiffs Carrie Ann Polonetsky, Wretha Evelyn Walker and Michael Abramsky were the beneficial owners of Lukens common stock at the times relevant to this action. They brought suit on their own behalf and on behalf of all holders of Lukens common stock, excluding the defendants, at the relevant times.

### B. Events Preceding the First Announcement of the Merger

Sometime in 1996 or early 1997, the Director Defendants began an inquiry into selling Lukens or merging it with another company. Although the Complaint lists over sixty companies in the steel industry that may have had an interest in buying Lukens, the Director Defendants conducted actual negotiations only with Allegheny Ludlum Corporation and Bethlehem.[2]

---

1. The facts presented here are those alleged in the Complaint. I will not refer to the proxy statement, which is attached to the Complaint, as proof of the matters reported therein, but only to determine what was, in fact, disclosed. *In re Santa Fe Pacific Corp. Shareholder Litig.*, Del.Supr., 669 A.2d 59, 69 (1995). I also take note of the Lukens certificate of incorporation, *see In re Wheelabrator Technologies Inc. Shareholders Litig.*, Del. Ch., Consol. C.A. No. 11495, mem. op. at 21–22, 1992 WL 212595, Jacobs, V.C. (Sept. 1, 1992), and the merger agreements, both of which can be examined by the Court "to establish formal, uncontested matters." *Santa Fe*, 669 A.2d at 70.

2. The Complaint does not allege any facts regarding the Director Defendants' efforts from the time they decided to inquire into selling the Company until just before they accepted the Bethlehem $25 per share offer. Of course, I do not thereby assume that the board did nothing for a year. Moreover, the proxy statement reports that in the weeks leading up to the $25 offer by Bethlehem, Allegheny made several offers at lower prices. While I do not rely, at this juncture, on facts disclosed in the proxy statement for their truth, I note that there clearly is no explicit challenge to any of the board's efforts preceding the $25 offer, except as described elsewhere in this Opinion.

At the 1997 stockholders meeting, the Lukens stockholders approved proposals (not supported by the Lukens board of directors) to remove the Company's poison pill and to declassify its board. The Director Defendants did not take steps to implement these proposals and later renewed the Company's poison pill. The Complaint quotes letters from several dissatisfied stockholders and implies that a proxy contest at the 1998 annual meeting was a possibility. Part of the stockholders' dissatisfaction stemmed from high compensation to management despite poor results.

On December 15, 1997, after allegedly discontinuing negotiations with Allegheny, Lukens announced that its board had accepted an offer from Bethlehem. Prior to executing the agreement with Bethlehem, the Lukens board acted to render the renewed poison pill inapplicable to the transaction.

## C. The Merger Agreement

The merger agreement announced on December 15, 1997, provided that Bethlehem would pay a combination of cash and shares of Bethlehem common stock having a total value of $25 per share for 100% of Lukens's common stock. In the merger, each Lukens shareholder would have the right to elect to receive the consideration in cash, subject to a maximum total cash payout equal to 62% of the total consideration. Including the assumption of about $250 million in debt, the deal was valued at roughly $650 million.

Bethlehem agreed to pay all sums payable under management's "golden parachutes" agreements, including a payment of over $20,000,000 to defendant Van Sant. The Complaint does not allege that there was any reason to doubt the validity or legal enforceability of those contracts. Rather, in highly colorful language, the Complaint alleges the following:

> [T]he Director Defendants, with Bethlehem's urging and cooperation, structured [the merger agreement] to favor Lukens' management that had done Bethlehem's bidding by rewarding them in honoring their "golden parachutes" from Lukens in full. In addition, Bethlehem agreed to pay all sums payable to those members of management who benefit from "change of control" provisions in their agreements with Lukens, a total of $56,000,000 . . . .

The Complaint mentions certain aspects of the merger agreement, including a $13.5 million termination fee, but focuses principally on terms *not* included in the agreement. I note, however, that the merger agreement included a "no solicitation" clause, thus preventing the Lukens board from soliciting a competing takeover offer. The no solicitation clause was connected to the customary "fiduciary out," allowing the board to adequately inform itself and take action on any unsolicited "superior proposal" from a third party. Upon receipt of a superior proposal, the Lukens board was, however, obliged to notify Bethlehem in writing of the terms and conditions of that proposal and could not accept the superior proposal until the fifth business day following Bethlehem's receipt of that written notice.

The Complaint does not directly challenge the validity of any of these provisions. Instead, the Complaint attacks the Director Defendants' decision to enter into the merger agreement and alleges that the board's failure to include certain other provisions in the Agreement (described below) constituted a breach of the Director Defendants' fiduciary duties.

## D. Allegheny Makes a Superior Offer

On December 22, 1997, just one week after the Bethlehem transaction was disclosed, Allegheny publicly announced that it had offered in a letter to Lukens's board to pay $28 per share, entirely in cash, to purchase 100% of Lukens's common stock. Including the assumption of debt, Allegheny's proposal was worth $715 million. Pursuant to the merger agreement, Luk-

ens informed Bethlehem of the competing offer.

Allegheny also announced its willingness "to enter into a merger agreement substantially identical" to the merger agreement. Comp. ¶ 34. This offer presumably included Allegheny's willingness to honor the validity of the golden parachutes.

On December 30, 1997, the Lukens board publicly announced its determination that the Allegheny proposal, presenting a 12% higher premium than that offered by Bethlehem, was a "superior proposal." The Complaint states that upon receiving the superior offer, the Lukens board "did not open up the sale of Lukens to a fair and competitive bidding process or consider the sale of assets piecemeal."

Lukens publicly announced on January 5, 1998 that it had entered into a revised merger agreement with Bethlehem in which Bethlehem agreed to pay a combination of cash and stock valued at $30 per share. The revised merger agreement reflected the higher value of the consideration, but was, in other respects, unchanged. In particular, the termination provisions of the revised agreement were no more preclusive of third party competing offers than at first. Despite this fact, no further offers were made.

### E. The Bethlehem—Allegheny Transaction

Bethlehem and Allegheny had different interests in acquiring Lukens. Allegheny was most interested in owning Lukens's stainless steel operations while Bethlehem particularly sought Lukens's plate steel business. According to the Complaint, the Director Defendants knew of these differing interests since the early negotiations during 1997.

The Complaint alleges that after the revised merger agreement was executed, Bethlehem "began secret discussions with Allegheny regarding a proposed carve-up of Lukens." These secret negotiations culminated almost a month later with an agreement providing that, after the merger became effective: (1) Allegheny would purchase Lukens's stainless steel operations from Bethlehem for $175,000,000; (2) Bethlehem would, for twenty years, provide stainless steel conversion services to Allegheny; and (3) Allegheny would supply stainless steel hot rolled bands to Bethlehem for reprocessing.

The Bethlehem—Allegheny transaction effectively ended the bidding for Lukens and is the source of some of the claims of breach of fiduciary duty leveled against the Director Defendants. The Complaint criticizes the Director Defendants' response to the "carve up," alleging that they should have refused to go forward with the merger in order to "seek to extract the complete value of Lukens from both Bethlehem and Allegheny." Further, it is alleged that the Director Defendants' failures to act "enabled Bethlehem to scuttle an active bidding contest," thus causing Lukens's stockholders to receive less than they would have received "had an open and fair sale process for Lukens taken place."

The Complaint also contains the quite unusual and unsupportable allegation that, by negotiating the "carve-up," Bethlehem violated its *fiduciary* duties to Lukens or Lukens's stockholders, as follows: "Bethlehem, once it positioned itself as the successful purchaser of Lukens, had the fiduciary obligation not to act in any way to adversely affect Lukens and its stockholders."

### F. Lukens Stockholders Vote in Favor of the Merger

On April 27, 1998, Lukens distributed to its stockholders a proxy statement in connection with the May 28, 1998 meeting at which they were asked to approve the merger. The Complaint does not identify any specific aspect of the proxy statement that it claims is false or misleading. Instead, the Complaint lists ten rhetorical questions relating to the conduct of the sale process by the Director Defendants

and alleges that the answers to these questions are absent from the proxy statement and material to the stockholders' deliberations. For example, the Complaint alleges that the proxy materials do not explain "why the Director Defendants had not attempted to canvass the market;" "why the Bethlehem bid had been accepted while Allegheny was still an active bidder;" "why there had been no consideration given to a piecemeal sale of assets;" and "why the Director Defendants took no action ... when the collusive agreement was publicly announced."

At the scheduled meeting, the Lukens stockholders approved the merger with Bethlehem and the transaction was consummated the following day.

## III. DISCUSSION

### A. Standard on a Motion to Dismiss

In considering a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[3] Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true."[4] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[5] Moreover, the court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint, e.g., in this case, the actual disclosures made in the proxy statement and the provisions of the Lukens certificate of incorporation.[6]

### B. The Parties' Contentions

The plaintiffs seek a declaration that the merger was "entered into and completed in breach of the fiduciary duties of the Director Defendants" and an order rescinding the merger or, if not possible, awarding rescissory damages. In this connection I note that, although the original and first amended complaints were filed prior to the stockholders meeting and the consummation of the merger, the plaintiffs never sought to enjoin the transaction. In addition, plaintiffs seek an order requiring the Director Defendants, Lukens and Bethlehem "to account for their wrongdoing" and to pay damages in an amount to be determined by the Court.

Count I of the complaint alleges that the Director Defendants breached their fiduciary duties by: (1) approving of and entering into the merger agreements, both of which contained "provisions designed to dissuade" other proposals, without determining whether doing so was in the best interest of Lukens stockholders; (2) failing to consider the effect that approving the merger would have "on Lukens' ability to obtain better offers"; (3) failing to take steps to ensure that the stockholders would receive the highest price reasonably available in the sale of Lukens; (4) failing to insist on provisions "to affirmatively protect Lukens from collusion" between Bethlehem and competing bidders; (5) tacitly accepting the Bethlehem—Allegheny transaction; and (6) issuing a materially misleading and incomplete proxy statement in connection with the merger. Count II alleges that Bethlehem knew of the Director Defendants' fiduciary obligations to Lukens's stockholders and acted and urged the Director Defendants to act contrary to those obligations. Further, by executing the merger agreement, Bethlehem allegedly "caused the Director Defen-

---

**3.** *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

**4.** *Id.*

**5.** *Id.*

**6.** See *In re Santa Fe Pac. Corp. Shareholder Litig.,* Del. Supr., 669 A.2d 59, 69–70 (1995).

dants to violate their fiduciary duties of loyalty and due care" and thereby is liable to plaintiffs for aiding and abetting the Director Defendants' breaches.

The Director Defendants argue that dismissal is proper because: (1) rescission of the merger is unavailable because it is either barred by laches or otherwise impractical; (2) an award of money damages is barred by Article Thirteenth of Lukens's Charter, which eliminates directorial liability in accordance with 8 *Del. C.* § 102(b)(7); (3) the Director Defendants' actions were either not subject to "*Revlon* duties" or, in the alternative, the Complaint fails to allege breach of such duties; and (4) the stockholders' ratification of the merger extinguishes any claims against the Director Defendants. Bethlehem argues that; (1) the Complaint fails adequately to allege any breach of duty by the Director Defendants; (2) the Complaint does not include facts establishing that Bethlehem "knowingly participated" in any breach of fiduciary duty; and (3) the plaintiffs were not damaged by any purported breach of fiduciary duty.

## C. What Type of Breaches of Duty, if Any, Are Adequately Alleged Against the Director Defendants?

I first note that plaintiffs' demand for rescission of the transaction is plainly futile. Even disregarding plaintiffs' failure to pursue injunctive relief prior to the shareholder vote, *although that option was readily available,* it goes without saying that at this juncture it is "impossible to unscramble the eggs." [7] Money damages being the only possible form of relief available, the question necessarily arises whether that form of relief is barred by Lukens's exculpatory provision. The presence of the section 102(b)(7) provision in the Lukens charter thus causes me to inquire, at the threshold, into the nature of the breaches of fiduciary duty alleged in the Complaint. Any claim that adequately alleges *solely* a violation of the duty of care and does not also allege the existence of circumstances constituting one of the exceptions to that exculpatory provision must be dismissed. *See* discussion *supra* Part III.E.

The well-pleaded allegations of the Complaint typify only a claim of negligence or gross negligence. For example, the Complaint accuses the Director Defendants of failing to act, as follows: to determine the interests of other potential acquirers; to consider the value of a break-up of the Company in numerous sale transactions instead of the sale of the Company as a whole; to include provisions in the merger agreement that protected Lukens and its stockholders from collusion among Bethlehem and other interested bidders; to use "the leverage provided by the Allegheny offer to seek to modify or eliminate the termination fee or any other provisions" of the merger agreement; to negotiate directly with Allegheny with respect to raising its offer; to adequately canvass the market; and so on.

Little or nothing in the Complaint speaks in terms of bad faith misconduct or disloyalty. To begin with, the Complaint contains only the most meager allegations about who the Director Defendants are. Paragraph 11 states that "Alexander, Dammeyer, Dunnigan, Gross, Helton, Nelson, Price, Thomas and Tippett are directors of Lukens and along with Van Sant comprise all of the members of the Lukens's Board of Directors ('the Board')." Paragraph 12 then alleges that Van Sant was Lukens's Chairman and CEO for five years before the merger. What is missing is any allegation of fact that a majority of the Director Defendants either stood on both sides of the merger or were dominated and controlled by someone who did. Indeed, only Van Sant (who, as Lukens's Chairman and CEO, was paid a sizeable

7. *Gimbel v. Signal Cos., Inc.,* Del. Ch., 316 A.2d 599, 603, *aff'd,* Del.Supr., 316 A.2d 619 (1974) (citation omitted).

severance benefit package in the merger) is even alleged to have an interest in the merger different than that of the Lukens stockholders as a whole.

Notwithstanding this paucity of particularized factual allegations tending to show that a majority of the Director Defendants lacked independence, plaintiffs offer several reasons why, they say, a sufficient predicate exists to support a claim of bad faith misconduct or disloyalty. First, they point to evidence of stockholder dissatisfaction with the Director Defendants during 1997, due to the Company's poor performance, and the possibility of a proxy contest at the 1998 annual stockholder meeting. From this, they infer that the Director Defendants' conduct in negotiating the sale of Lukens was improperly motivated, as shown by the Director Defendants' alleged decision to "single[ ] out Bethlehem and Allegheny ... for merger discussions." They then allege in a wholly conclusory fashion that "[d]riving the Director Defendants' adamant goal to make a deal with Bethlehem was not what was in the best interest of Lukens' stockholders, but, rather, avoiding an upcoming Lukens's annual meeting at which they would have to report and account for their mismanagement resulting in over two consecutive years of losses and face a possible proxy contest." Second, the Complaint makes the absurdly complicated and ineffective allegation that "the Director Defendants, with Bethlehem's urging and cooperation, structured both [merger agreements] to favor Lukens' management that had done Bethlehem's bidding by rewarding them in honoring their 'golden parachutes' from Lukens in full." Incongruously, the Complaint nowhere alleges facts showing that any of the employment contracts between Lukens and its managers, or the change of control provisions of those contracts, were invalid or otherwise unenforceable.

■ Neither of plaintiffs' arguments supports a conclusion that the Complaint states a claim for a breach of the duty of loyalty or actions taken other than in good faith. As to the first contention, there is no logical force to the suggestion that otherwise independent, disinterested directors of a corporation would act disloyally or in bad faith and agree to a sale of their company "on the cheap" merely because they perceived some dissatisfaction with their performance among the stockholders or because of the possibility that a third of their number might face opposition for reelection at the next annual stockholders meeting. Plainly, there is no allegation of an improper entrenchment motive in these facts. On the contrary, by approving the merger agreements, the Director Defendants affirmatively agreed to give up their directorial positions.

Moreover, the timing of events alleged in the Complaint is out of sequence. The Complaint alleges that the Lukens board decided to explore a sale of the Company "in 1996 or early 1997"—some months before the two shareholder proposals were approved at the April 1997 annual meeting and even longer before the August and December 1997 letters expressing stockholder dissatisfaction. These facts negate any claim that the Director Defendants rushed to scuttle the ship before being forced to walk the plank, as plaintiffs suggest.

The process pursued by the Director Defendants that is reflected in the Complaint, considered as a whole and taking as true the well-pleaded allegations of fact, provides no support for any inference of bad faith or disloyalty. According to the Complaint, the Director Defendants pursued merger discussions for a year or more before agreeing to a merger on a price term ($25 per share in cash and securities) that, although not the best value ultimately attainable, is not alleged to have been inadequate or unfair. One week after Lukens announced this transaction, Allegheny, conclusively undeterred from bidding, first publicly announced an offer to buy Lukens for $28 per share in cash and stated that it would be willing to enter into a merger agreement substantially

identical to the one signed by Lukens and Bethlehem. Plaintiffs do not allege that this $28 proposal was inadequate or unfair. Finally, the Complaint alleges that the Director Defendants asked Bethlehem to respond to this offer and that Bethlehem then agreed to pay $30 per share.

The Complaint studiously avoids alleging that the revised merger agreement contained any terms or provisions more likely to stifle competition than at first. Rather, the Complaint makes the odd and unlikely charge that the Director Defendants breached their fiduciary duties by their failure to use the leverage provided by the Allegheny $28 bid to "seek to modify or eliminate the termination fee or any other provisions of the Agreement, including the no-shop provision, or add[ ] terms that would have precluded any subsequent sale of Lukens' assets without Lukens stockholders benefiting therefrom." Experience teaches (contrary to this claim) that when a merger partner agrees to top a competing bid and, in doing so raises its own bid by 20%, the terms of the merger agreement are apt to be strengthened in its favor, not weakened so as to offer it less protection.[8]

■ As to the claim based on the fact that Bethlehem agreed to pay management's "golden parachutes," I can only say that the plaintiffs' allegations stop short of the goal line. The only director alleged to benefit under these payments was Van Sant. Without alleging that Van Sant dominated or controlled a majority of the board, there is no basis to say that the board as a whole lacked independence.[9] Thus, the payment of a substantial golden parachute to Van Sant does not implicate the Director Defendants' duties of loyalty or good faith.[10] More importantly, the Complaint does not challenge the validity or enforceability of the "golden parachute" contracts and acknowledges that Allegheny "was prepared to enter into a merger agreement *substantially identical*" (emphasis added) to the Bethlehem merger agreement. I infer from this that Allegheny was also willing to honor the golden parachute payments. In the circumstances, there is simply no basis for inferring that directorial approval of a transaction providing for their payment was the product of disloyalty or bad faith.[11]

## D. The Presence of a "Revlon" Claim Does Not Necessarily Implicate the Duty of Loyalty

Anticipating that the Complaint might not adequately allege facts sufficient to survive a motion to dismiss, plaintiffs argue that a properly alleged claim that the Director Defendants' decisions are to be examined under the heightened standard described in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*[12] inherently implicates the duty of loyalty. Thus, they argue, the section 102(b)(7) charter provision cannot operate at this juncture to require dismissal of the action.

Plaintiffs claim that when so-called "*Revlon* duties" are alleged, the duties of care, good faith and loyalty become "intertwined" so that directorial failure to obtain

---

8. Although it does not bear on my decision, I note that the proxy statement reports that, as part of the negotiations over the amended merger agreement, Bethlehem tried unsuccessfully to secure an increase in the amount of the termination fee.

9. See generally *Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984).

10. See *In re The Walt Disney Co. Deriv. Litig.*, Del. Ch., Consol. C.A. No. 15452, mem. op. at 30, 731 A.2d 342, 370, Chandler, C. (Oct. 7, 1998).

11. See, e.g. *Golden Cycle, LLC v. Allan*, Del. Ch., C.A. No. 16301, mem. op. at 28–29, 1998 WL 892631, Lamb, V.C. (Dec. 10, 1998) (holding that although the plaintiff, who was the losing bidder in a sale of corporate control, indicated its intent to litigate the validity of certain stock option and compensation packages benefiting the director defendants, the board was not sufficiently conflicted to implicate the entire fairness standard).

12. Del.Supr., 506 A.2d 173 (1986).

the highest price, even if solely due to gross negligence, amounts to a breach of the duty of loyalty. Plaintiffs cite the Supreme Court's opinions in *In re Santa Fe Pacific Corp. Shareholder Litig.,*[13] *Mills Acquisition Co. v. Macmillan, Inc.*[14] and several other cases as holding that a properly alleged *Revlon*-based claim *necessarily* implicates the duty of loyalty. In *Santa Fe,* the Supreme Court stated that director duties in situations implicating the teachings of *Revlon* and *Unocal Corp. v. Mesa Petroleum Co.*[15] "do not admit of easy categorization as duties of care or loyalty."[16] The plaintiffs cling to this statement in arguing that by merely alleging that the Director Defendants' conduct should be reviewed under *Revlon* and its progeny, it is impossible to conclude that the Complaint alleges only breaches of the duty of care.

This argument is not an accurate depiction of the law and misplaces the effect of *Revlon.* Although an important comment on the need for heightened judicial scrutiny when reviewing situations that present unique agency cost problems, *Revlon* did not fundamentally alter Delaware's corporate law.[17] "*Revlon* duties" refer only to a director's performance of his or her duties of care, good faith and loyalty in the unique factual circumstance of a sale of control over the corporate enterprise.[18]

Although this court and the Supreme Court may use the term to categorize certain claims, "there are no special and distinct '*Revlon* duties.'"[19]

■ A director's duty in conducting a sale of corporate control is to seek out, in a manner consistent with his or her triad of fiduciary duties,[20] "the best value reasonably available to the stockholders."[21] A corporate board's failure to obtain the best value for its stockholders may be the result of illicit motivation (bad faith), personal interest divergent from shareholder interest (disloyalty) or a lack of due care.[22]

■ Rather than adding to or "intertwining" a corporate board's triad of distinct duties, as plaintiffs argue, the *Revlon* case, like *Unocal* before it, indicates that heightened judicial scrutiny is warranted, because "a court evaluating the propriety of a change of control or a takeover defense must be mindful of 'the omnipresent specter that a board may be acting primarily in its own interest, rather than those of the corporation and its shareholders.'"[23] If a complaint merely alleges that the directors were grossly negligent in performing their duties in selling the corporation, without some factual basis to suspect their motivations, any subsequent finding of lia-

13. Del.Supr., 669 A.2d 59, 67 (1995).

14. Del.Supr., 559 A.2d 1261, 1284 (1989).

15. Del.Supr., 493 A.2d 946 (1985).

16. *Santa Fe,* 669 A.2d at 67.

17. *Barkan v. Amsted Indus., Inc.,* Del.Supr., 567 A.2d 1279, 1286, n. 2 (1989) ("Because the rule in *Revlon* is derived from fundamental principles of corporate law and flows directly from precedents such as *Unocal,* its announcement did not produce a seismic shift in the law governing changes of corporate control").

18. *See Barkan,* 567 A.2d at 1286 (citing *Unocal,* 493 A.2d at 954–55 *and Revlon,* 506 A.2d at 180).

19. *Macmillan,* 559 A.2d at 1288.

20. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 361 (1993).

21. *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 48 (1994).

22. *See, e.g., Macmillan,* 559 A.2d at 1279–82 (holding that the defendant directors breached their duties of loyalty *and* care by being "torpid, if not supine, in [their] efforts to establish a truly independent auction," free of manipulation by interested persons, where the defendant directors actions "materially contributed to the unprincipled conduct of those upon whom [they] looked with a blind eye").

23. *Barkan,* 567 A.2d at 1286 (quoting *Unocal,* 493 A.2d at 954).

bility will, necessarily, depend on finding breaches of the duty of care, not loyalty or good faith.[24]

■ In light of the foregoing, assuming that the Director Defendants' actions are to be reviewed under *Revlon*'s heightened scrutiny,[25] the Complaint does not adequately allege that they acted in bad faith or disloyally. Thus, if the Director Defendants breached their "*Revlon* duties," they breached their duty of care and nothing more.[26]

### E. Article Thirteenth of the Lukens Charter, Enacted Pursuant to Section 102(b)(7) of the DGCL, Requires Dismissal of the Duty of Care Claims Alleged in the Complaint

It remains to address the effect of the exculpatory charter provision found in Article Thirteenth of Lukens's Charter (the " § 102(b)(7) Provision").[27] Because it appears, after careful examination of the Complaint, that "the factual basis for a claim *solely* implicates a violation of the

---

**24.** *See, e.g., Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985) (finding that the board of directors violated its duty of care in evaluating a merger proposal and recommending it for shareholder approval).

**25.** The parties have spent a great deal of time arguing about whether *Revlon* duties apply. I find that, assuming that *Revlon* is implicated, the Complaint must still be dismissed. I nevertheless note that although there is no case directly on point, I cannot understand how the Director Defendants were *not* obliged, in the circumstances, to seek out the best price reasonably available. The defendants argue that because over 30% of the merger consideration was shares of Bethlehem common stock, a widely held company without any controlling shareholder, *Revlon* and *QVC* do not apply. I disagree. Whether 62% or 100% of the consideration was to be in cash, the directors were obliged to take reasonable steps to ensure that the shareholders received the best price available because, in any event, for a substantial majority of the then-current shareholders, "there is no long run." *TW Servs., Inc. v. SWT Acquisition Corp.*, Del. Ch., C.A. Nos. 10427, 10298, mem. op. at 20, 1989 WL 20290, Allen, C. (Mar. 2, 1989). I do not agree with the defendants that *Santa Fe*, in which shareholders tendered 33% of their shares for cash and exchanged the remainder for common stock, controls a situation in which over 60% of the consideration is cash. The Supreme Court has not set out a black line rule explaining what percentage of the consideration can be cash without triggering *Revlon*. I take for granted, however, that a cash offer for 95% of a company's shares, for example, even if the other 5% will be exchanged for the shares of a widely held corporation, will constitute a change of corporate control. Until instructed otherwise, I believe that purchasing more than 60% achieves the same result.

**26.** In *In re J.P. Stevens & Co., Inc.*, Del. Ch., 542 A.2d 770 (1988), Chancellor Allen examined the different ways in which *Revlon* could be viewed. After discussing the facts of *Revlon* which indicated that the Revlon directors were conflicted (thus of divided loyalties) and the alternative view of the case, namely that *Revlon* set out "rules about the kind of agreements that may not be entered during" the sale of corporate control, "even by a disinterested, fully functioning board", the Chancellor indicated his understanding that *Revlon* is best explained as a breach of the duty of loyalty case. *Id.* at 778–81. I note my general agreement that the heightened scrutiny set out in *Revlon*, as well as *Unocal*, is best rationalized as resting on "the omnipresent specter that a board may be acting primarily in its own interests." *Unocal*, 493 A.2d at 954. Where a plaintiff does not adequately implicate any such directorial conflict, heightened judicial scrutiny will not often result in a greater likelihood of liability than if the business judgment presumption applied from the outset.

**27.** Article Thirteenth provides:

No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such a director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for payment of unlawful dividends or approval of illegal stock purchases or redemptions prohibited pursuant to Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which such director derived an improper personal benefit.

duty of care ... the protections of such a charter provision may properly be invoked and applied." [28] Therefore, on the basis of that charter provision, I will dismiss any and all claims predicated on the Director Defendants' alleged failure to exercise due care in their conduct of the process of selling Lukens, including their alleged failure to take steps to prevent the Bethlehem—Allegheny "carve up" transaction.

I do not read the Supreme Court's recent opinion in *Emerald Partners v. Berlin* [29] to preclude dismissal of plaintiffs' duty of care claim. In that case, the Court of Chancery granted summary judgment for the defendants, on the ground that the complaint attacking a merger between a corporation and its controlling stockholder did not sufficiently plead an entire fairness claim. The Supreme Court reversed, concluding that the entire fairness claim was adequately pleaded and that the summary judgment record did not provide a sufficient factual basis to determine whether or not the burden of proof on that issue had been shifted to the plaintiffs. [30]

Next, and most pertinent to the analysis here, the Supreme Court overruled the decision of the trial court to examine the disclosure claims distinct and apart from the entire fairness analysis and to dismiss the disclosure claims on the basis of a section 102(b)(7) charter provision. The Supreme Court concluded that, in the context of an entire fairness analysis, disclosure claims are not easily categorized as arising under only the duty of care, holding that "[s]ince we conclude that the disclosure claims here alleged are not so categorized, the analysis falls short." [31]

The Supreme Court went on to state that a section 102(b)(7) provision is *"in the nature of* an affirmative defense.... [Defendants] will normally bear the burden of establishing each of its elements." [32] Plaintiffs argue that this assignment of an evidentiary burden to defendants precludes a Rule 12(b)(6) dismissal in this case, irrespective of whether the Complaint alleges any breach of duty fitting one of the exceptions to the § 102(b)(7) Provision. According to plaintiffs, the § 102(b)(7) Provision can only be raised as an affirmative defense and the Court can only determine its applicability on the basis of a well-developed factual record.

Nothing in the *Emerald Partners* opinion requires such a narrow or crabbed reading of section 102(b)(7) charter provisions. [33] Indeed, the *Emerald Partners* court explicitly recognized that "where the factual basis for a claim *solely* implicates a violation of the duty of care ... the protections of such a charter provision may properly be invoked and applied." Moreover, the context of this statement, juxtaposed as it is to the language (quoted above) assigning a burden of proof to the person seeking exculpation, strongly suggests its applicability in the context of a motion to dismiss where *only* duty of care claims are alleged.

Thus, I read *Emerald Partners's* treatment of 8 *Del. C.* § 102(b)(7) to mean that where a complaint adequately alleges an entire fairness claim (implicating, at least initially, elements of good faith, loyalty and care), the burden will be on a director defendant to show his or her entitlement

**28.** *Emerald Partners v. Berlin,* Del.Supr., 726 A.2d 1215, 1224 (1999).

**29.** *Id.*

**30.** *Id.* at 1222–23 (citations omitted).

**31.** *Id.* at 1223.

**32.** *Id.* at 1223–24 (emphasis added) (citations omitted).

**33.** Like Vice Chancellor Strine, in *In re General Motors Class H Shareholders Litig.,* Del.

Ch., 734 A.2d 611, 619 at n. 7 (1999), I do not read *Emerald Partners* to preclude "a Rule 12(b)(6) dismissal of claims that the directors breached their fiduciary duty of care on the *basis* of an exculpatory charter provision so long as dismissal on that *basis* does not *thereby* preclude plaintiffs from pressing well-pleaded allegations that the directors breached their fiduciary duties of loyalty and good faith."

to the immunizing effect of the charter provision. Similarly, if a complaint adequately alleges bad faith or disloyalty, or some other exceptional circumstance under 8 *Del. C.* § 102(b)(7),[34] or if the nature of the alleged breach of duty is unclear,[35] the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of an exculpatory charter provision.[36]

■ Here the Complaint alleges, if anything, only a breach of the duty of care. The function of the § 102(b)(7) Provision is to render duty of care claims not cognizable [37] and to preclude plaintiffs from pressing claims of breach of fiduciary duty, absent the most basic factual showing (or reasonable basis to infer) that the directors' conduct was the product of bad faith, disloyalty or one of the other exceptions listed in the statute.[38] Dismissal is proper where no exception is alleged.[39] Further, *Emerald Partners* supports the conclusion that the Director Defendants

are entitled to this dismissal at this stage of the process, without having to engage in discovery or shoulder the burden of proving that they acted loyally and in good faith.[40]

## F. Can the Aiding and Abetting Claim Against Bethlehem Survive?

■ Generally, where allegations of aiding and abetting are made, a claim will survive a motion to dismiss only where the plaintiff pleads the following elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach." [41] The courts of this state have added a fourth requirement—the necessity of alleging damages.[42]

■ Knowing participation, though it need not be pleaded with particularity, must be reasonably inferred from the facts

**34.** *See, e.g., Leslie v. Telephonics Office Technologies, Inc.*, Del. Ch., C.A. No. 13045, mem. op. at 23, 1993 WL 547188, Allen, C., (Dec. 30, 1993) (refusing to bar the plaintiffs claims on account of a § 102(b)(7) provision where the complaint alleges an "intentional scheme to siphon off the company's assets").

**35.** *See, e.g., Sanders v. Wang*, C.A. No. 16640, mem. op. at 28, 1999 WL 1044880, Steele, V.C. (Nov. 8, 1999).

**36.** *Accord General Motors*, 734 A.2d at 619, n. 7.

**37.** *John Hancock Capital Growth Management, Inc. v. Aris Corp.*, Del. Ch., C.A. No. 9920, mem. op. at 4, 1990 WL 126656, Jacobs, V.C. (Aug. 24, 1990) (stating that claims of directorial gross negligence are "not cognizable" where a § 102(b)(7) provision applies).

**38.** *In re Dataproducts Corp. Shareholders Litig.*, C.A. No. 11164, mem. op. at 11–12, 1991 WL 165301, Jacobs, V.C. (Aug. 22, 1991) (stating that where plaintiffs do not allege facts that "even inferentially" suggest bad faith or harmful intent, those claims are "precluded" by the § 102(b)(7) provision).

**39.** *See In re Wheelabrator Technologies, Inc., Shareholders Litig.*, Del. Ch., C.A. No. 11495, mem. op. at 22–23, 1992 WL 212595, Jacobs, V.C. (Sept. 1, 1992) (taking judicial notice of a

corporate charter even though it was not mentioned in the complaint and then dismissing the duty of care claims to the extent they sought monetary damages, based on the § 102(b)(7) provision contained in that charter); *Goodwin v. Live Entertainment, Inc.*, Del. Ch., C.A. No. 15765, 1999 WL 64265, Strine, V.C., mem. op. at 10 (Jan. 22, 1999), (claim for breach of the fiduciary duty of care barred by exculpatory charter provision), *aff'd*, Del. Supr., No. 72, 1999, 1999 WL 624128 (Jul. 23, 1999) (ORDER).

**40.** In *Levy v. Stern*, C.A. No. 11955, 1996 WL 118160, Balick, V.C. (Apr. 19, 1996), *rev'd*, Del.Supr., 687 A.2d 573, No. 211, 1996, 1996 WL 742818, Walsh, J. (Dec. 20, 1996) (ORDER), this court granted summary judgment to the defendants, stating that the plaintiffs failed to develop claims they sought to allege falling within one of the exceptions applicable in that case. Justice Walsh, writing for the Supreme Court, reversed the lower court's ruling because the summary judgment record was improperly limited by defendants' abuse of the discovery process. 1996 WL 742818, at *3–4.

**41.** *Santa Fe*, 669 A.2d at 72.

**42.** *See Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1057 (1984), *aff'd*, Del.Supr., 575 A.2d 1131 (1990).

alleged in the complaint.[43] For example, the Complaint's conclusory allegation that Bethlehem "approved and urged" the Director Defendants to enter into the Merger Agreements does not satisfy this pleading burden.[44]

 Plaintiffs argue that Bethlehem "knowingly participated" in the alleged breaches of duty, first, by agreeing to pay the golden parachutes and second, by making an initial offer that they knew was "grossly underpriced." Neither of these claims warrants much discussion.

First, there is no allegation of fact in the Complaint that the golden parachute payments were not valid obligations of the Company. If Bethlehem acquired Lukens, it would become legally bound to honor valid obligations such as the golden parachutes. The fact that Bethlehem chose not to challenge the validity of the agreements clearly does not establish Bethlehem's complicity with the Director Defendants' alleged breaches of duty.

Second, as to the claim that Bethlehem's offer was "grossly underpriced," no particularized facts are alleged to support this conclusory assertion. Moreover, it should be obvious that "an offeror may attempt to obtain the lowest possible price for stock through arms'-length negotiations." [45] The only allegation that the negotiations were not at arms' length relates to the golden parachute payment, which, as discussed above, neither raises a question as to the Director Defendants' self-interest nor implicates Bethlehem in any "conspiracy" to breach fiduciary duties.[46]

Finally, the plaintiffs argue that Bethlehem's willingness to negotiate agreements that failed to protect Lukens stockholders from the Bethlehem—Allegheny "carve up" transaction somehow establishes knowing participation in the alleged breaches. I might be concerned if the Director Defendants knew of Bethlehem's contacts with Allegheny. However, the Complaint plainly states that Bethlehem engaged in "secret" negotiations with Allegheny. This fact also refutes any conspiracy theory.

For all these reasons, the aiding and abetting claim against Bethlehem will be dismissed.

## G. Does the Complaint Allege Breach of the Duty of Disclosure?

The Complaint does not identify any misrepresentation in the proxy statement. Instead, it lists ten questions that the plaintiffs argue should have been answered in the proxy statement.[47] The questions posed relate to *why* the Director Defendants failed to do things, such as: canvass the market, prevent the Bethlehem—Allegheny Transaction, consider a piecemeal sale of the Company's assets, negotiate directly with Allegheny, and use the added leverage provided by Allegheny's $28 proposal to amend the terms of the merger agreement. The omission of this information is alleged to have rendered the proxy statement materially incomplete or misleading.

 A cognizable claim for breach of the duty of disclosure rests on finding that

43. *Weinberger v. Rio Grande Indus., Inc.,* Del. Ch., 519 A.2d 116, 131 (1986).

44. *Santa Fe,* 669 A.2d at 72 (holding that the conclusory statement that the alleged aider and abettor "had knowledge of" the director defendants' fiduciary duties and "knowingly and substantially participated and assisted" in the alleged breaches did not state a claim).

45. *Gilbert,* 490 A.2d at 1058.

46. *Id.*

47. For the most part, these questions pertain to the Director Defendants alleged breaches of duty. To the extent that the failure to answer these questions is allegedly due solely to the directors' lack of care, and not in any way motivated by bad faith, disloyalty or misconduct, such claims can also be dismissed because of the presence of the § 102(b)(7) Provision. *See* discussion *infra* Part III.E; *Arnold v. Society for Savings Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1287 (1994).

the non-disclosed information is material.[48] "What the standard ... contemplate[s] is a showing of a substantial likelihood that,. under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder."[49]

■ The information allegedly omitted here was plainly not material. The proxy statement discusses a year-long process of inquiring into and eventually negotiating a merger transaction. It provides a detailed, nearly daily account of how events unfolded from early December 1997 until the signing of the revised merger agreement on January 5, 1998. None of this is challenged in the Complaint. What the proxy statement does not do is explain why the board chose *not* to take particular courses of action. Of course, requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.[50]

In addition, the questions posed by the plaintiffs, by and large, do no more than reflect the plaintiffs' substantive allegations of wrongdoing. It is well understood that directors are not required to engage in "self-flagellation" by disclosing their alleged breaches of duty.[51] Plaintiffs claim that these questions do not require admissions of wrongdoing, but rather information about the *process* of selling the Company. I disagree. As explained above, that process is described in considerable detail in the proxy statement. To have added information explaining why the Director Defendants did not take other steps or follow another process was not required.

In sum, it is not enough simply to pose questions that are not answered in the proxy statement.[52] To survive a motion to dismiss, challenges to proxy statement disclosure must be based on the alleged omission or misrepresentation of a material fact. The questions posed in the Complaint do not meet this test of materiality.

## H. Did Shareholder Ratification of the Merger Extinguish the Claims?

■ The defendants argue strenuously that the approval of the merger by a majority of Lukens public stockholders extinguished any claims resting solely on alleged breaches of the duty of care.[53] The issue is whether that conclusion can be squared with the Supreme Court's decision in *In re Santa Fe Pacific Corp. Shareholder Litig.*[54] Although the matter is hardly free from doubt, I conclude that, in the circumstances presented in this case, the vote of the Lukens stockholders authorizing and approving the merger extin-

48. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).

49. *Id.* (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

50. *See TCG Sec., Inc. v. Southern Union Co.,* Del. Ch., C.A. No. 11282, mem. op. at 18, 1990 WL 7525, Chandler, V.C. (Jan. 31, 1990) ("a reasonable line has to be drawn or else disclosures in proxy solicitations will become so detailed and voluminous that they will no longer serve their purpose").

51. *Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 145 (1997); *Margolies v. Pope & Talbot, Inc.,* Del. Ch., C.A. No. 8244, mem. op. at 18, 1986 WL 15145, Hartnett, V.C. (Dec. 23, 1986).

52. As pointed out by the defendants, some of the questions actually are answered, at least in general terms. For example, while the plaintiffs ask for disclosure answering why the market was not canvassed, the proxy statement states that the Lukens board "engaged in exploratory discussions ... with certain third parties" regarding possible business combinations. While this does not specifically constitute a canvassing of the market, it leads to the inference that the Lukens board took steps to inform itself of Lukens's market value.

53. *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 889 (1985).

54. Del.Supr., 669 A.2d 59 (1995).

guished the well-pleaded claims in the Complaint.

In *Smith v. Van Gorkom*, the Supreme Court said that "a discovered failure of the Board to reach an informed business judgment in approving the merger constitutes a voidable, rather than a void, act." [55] The Court went on to say that "the settled rule in Delaware is that 'where a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail.' " [56] In that case, the Court refused to recognize the ratifying effect of the vote because it concluded that the proxy materials sent to stockholders were false and misleading. Nevertheless, *Smith v. Van Gorkom* clearly stands for the proposition that, in the appropriate case, a fully informed vote of stockholders approving a merger will extinguish a claim for breach of fiduciary duty stemming from a board of directors' failure to reach an informed business judgment in authorizing that transaction.

The Supreme Court revisited the issue of ratification in *Santa Fe*. There, the complaint challenged defensive actions taken unilaterally by a board of directors in the context of a hotly contested hostile contest for corporate control. At the end of the day, the disfavored suitor withdrew, and the stockholders were asked to approve the merger agreement the board had negotiated with its chosen partner. The Supreme Court refused to find that the vote approving the merger ratified the board's conduct in erecting defensive measures against the other bidder. The problem lay in the incongruity between the proposal voted on (the merger agreement) and the subject matter of the claimed breaches of fiduciary duty (defensive measures that precluded stockholder consideration of a competing bid). As the Supreme Court said:

In voting to approve the Santa Fe–Burlington merger, the Santa Fe stockholders were not asked to ratify the Board's unilateral decision to erect defensive measures against the Union Pacific offer. The stockholders were merely offered a choice between the Burlington Merger and doing nothing. The Santa Fe stockholders did not vote in favor of the precise measures under challenge in the complaint. Here, the defensive measures had already worked their effect before the stockholders had a chance to vote. . . .

Since the stockholders of Santa Fe merely voted in favor of the merger and not the defensive measures, we decline to find ratification in this instance.[57]

The Supreme Court further justified this result by stating that it "would frustrate the purposes underlying *Revlon* and *Unocal*" to permit "the vote of a majority of the stockholders on a merger to remove from judicial scrutiny unilateral Board action in a contest for corporate control." [58]

The question I must answer is whether *Santa Fe* precludes a finding of ratification in a case, such as this, where there was an active bidding process, no measures precluded any participant from bidding, and the merger agreement presented to stockholders represented the highest offer made by anyone. I conclude it does not.

Unlike the situation in *Santa Fe*, the proposition voted on by the Lukens stockholders fairly framed the question whether or not to ratify the job done by the Lukens directors in managing the bidding process. As it affects the final proposal, the crux of the claim made against the Director Defendants is that they failed to takes steps to protect against the Bethlehem—Allegheny "carve up." This failure is alleged to have deprived the Lukens stockholders of the opportunity to receive the highest

---

**55.** 488 A.2d at 889.

**56.** *Id.* at 890 (quoting *Gerlach v. Gillam*, Del. Ch., 139 A.2d 591, 593 (1958)).

**57.** *Santa Fe*, 669 A.2d at 68.

**58.** *Id.*

and best value for their shares.[59] But that deal was well-known to the stockholders when they voted and was itself contingent on their approval of the Bethlehem merger proposal. In a very clear and real sense, the vote to approve the Bethlehem merger proposal represents a decision that it was better to approve that transaction (*notwithstanding* the known possibility that the "carve up" deprived Lukens's stockholders of some incremental value) than to reject the $30 proposal and either "do nothing" or remarket the Company in a way that prevented collusion among bidders.

This analysis sufficiently distinguishes this case from *Santa Fe* to require a different result. Ultimately, the only well-pleaded allegation in the Complaint is the "*Revlon*" claim that the Director Defendants dropped the ball by failing to protect against the "carve up." Unlike the situation in *Santa Fe*, it would not "frustrate the purposes underlying *Revlon* and *Unocal*" to "[p]ermit[ ] the vote of a majority of stockholders on a merger to remove from judicial scrutiny" this sort of duty of care based claim.[60] Indeed, one is prompted to ask what purpose would be served by a rule that allowed the Lukens stockholders both to approve the $30 proposal (knowing of the "carve up") and to maintain an action against their directors for failing to do better.

Finally, I note that a large majority of the putative plaintiff class (alleged to include all Lukens stockholders other than the Director Defendants) both voted in favor of the merger and received the benefits of it. Even if this case were to continue, plaintiffs would confront substantial obstacles in continuing the action on behalf of those persons.[61]

## IV. CONCLUSION

For all of the foregoing reasons, the defendants' motions to dismiss shall be GRANTED and the Plaintiffs' Second Amended and Supplemental Consolidated Class Action Complaint shall be DISMISSED, with prejudice, costs to the defendants. IT IS SO ORDERED.

59. Of course, there was a rights plan and the merger agreement did contain a termination fee. But neither of these measures is alleged to have precluded Allegheny or anyone else from bidding. Indeed, Allegheny made its $28 bid while both of these measures were in place.

60. *Santa Fe*, 669 A.2d at 68.

61. *Kahn v. Household Acquisition Corp.*, Del. Supr., 591 A.2d 166, 176–77 (1991).