# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SMART LOCAL UNIONS AND COUNCILS PENSION FUND, on behalf of itself and all other similarly situated former stockholders of EIDOS THERAPEUTICS, INC., | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2021-1030-PAF |
| BRIDGEBIO PHARMA, INC., NEIL KUMAR, ALI SATVAT, and UMA SINHA, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: September 19, 2022
Date Decided: December 29, 2022

Thomas Curry, Tayler D. Bolton SAXENA WHITE P.A., Wilmington, Delaware; David Wales SAXENA WHITE P.A., White Plains, New York; Gregory V. Varallo BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Jeremy Friedman OSTER & TEJTEL PLLC, Bedford Hills, New York; *Attorneys for Plaintiff Smart Local Unions and Councils Pension Fund*.

Cliff C. Gardner, Andrew D. Kinsey SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Defendants BridgeBio Pharma, Inc., Neil Kumar, Ali Satvat, and Uma Sinha*.

**FIORAVANTI, Vice Chancellor**

A former stockholder of Eidos Therapeutics, Inc. ("Eidos" or the "Company") challenges a January 2021 merger in which BridgeBio Pharma, Inc. ("BridgeBio") acquired the remaining 37% of Eidos's common stock that it did not already own (the "Transaction"). In the Transaction, Eidos stockholders had the right to elect to receive either 1.85 shares of BridgeBio common stock or $73.26 in cash for each share of Eidos common stock.

The plaintiff has asserted claims alleging that BridgeBio breached its fiduciary duties as Eidos's controlling stockholder in connection with the merger. The plaintiff further alleges that three Eidos directors who also served as officers or directors of BridgeBio at the time of the Transaction breached their fiduciary duties by approving the merger.

The defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. There is no dispute that the merger was an interested transaction involving a controlling stockholder, presumptively subject to review under the exacting entire fairness standard. The only issue on this motion is whether the Transaction complied with the framework established in *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) ("*MFW*"), so as to subject the claims to business judgment review instead of entire fairness. Plaintiff argues that the defendants have not satisfied four of the six elements of the *MFW* framework.

Central to plaintiff's opposition is the Company's rejection of multiple proposals by global pharma giant GlaxoSmithKline plc ("GSK") to partner with or acquire Eidos. Plaintiff contends that the Company's treatment of the GSK proposals and the disclosures concerning those proposals in the proxy statement render *MFW* inapplicable.

For the reasons explained below, the court concludes that the defendants have satisfied *MFW*. Thus, the Transaction is subject to review under the business judgment standard, and the complaint must be dismissed.

## I. BACKGROUND

The facts are drawn from the Verified Stockholder Class Action Complaint (the "Complaint")[1] and documents integral thereto, including documents produced to the plaintiff in response to a books and records demand under 8 *Del. C.* § 220, and documents otherwise subject to judicial notice.[2]

### A. The Parties

Immediately prior to the closing of the Transaction, Eidos was a Delaware corporation and its shares were publicly traded on Nasdaq Global Select Market under the ticker symbol "EIDX." Eidos is a development-stage biopharmaceutical

---

[1] C.A. No. 2021-1030-PAF, Docket ("Dkt.") 1 ("Compl.).

[2] The parties submitted exhibits with their briefs. This opinion cites to the exhibits by reference to the party offering the exhibit and the corresponding exhibit number. *E.g.*, Defs.' Ex. 1.

company focused on developing a product to treat transthyretin amyloidosis, a progressive condition that can lead to heart failure and other life-threatening conditions.[3] The Eidos drug, known as acoramidis or AG10, seeks to slow the progression of the disease by stabilizing the proteins that cause the disease's symptoms.[4]

Defendant BridgeBio is a Delaware corporation headquartered in Palo Alto, California.[5] Its shares are publicly traded on the Nasdaq Global Select Market. BridgeBio develops and commercializes treatments for genetic diseases and houses each drug development program in a separate dedicated subsidiary.[6] Immediately prior to the Transaction, BridgeBio owned approximately 63.2% of the outstanding shares of Eidos.[7]

Defendants Neil Kumar, Ali Satvat, and Uma Sinha were three of the six members of the Eidos board of directors (the "Eidos Board") at the time of the

---

[3] Compl. ¶ 32.

[4] *Id.* ¶¶ 33–34.

[5] *Id.* ¶ 27.

[6] *Id.* ¶ 35.

[7] *Id.* ¶ 37.

Transaction.[8]  At that time, all three served simultaneously as a director, officer, or both, of BridgeBio.[9]

Kumar served as CEO of Eidos and a director on the Eidos Board beginning in April 2015 and continuing through the closing of the Transaction, while also serving as a director and CEO of BridgeBio, which he co-founded.[10]  Satvat served on the Eidos Board from June 2018 through the closing of the Transaction, during which time he also served as a director of BridgeBio.[11]  Satvat is a partner at Kohlberg Kravis Roberts & Co. LP ("KKR"), a private equity firm that owns approximately 28% of BridgeBio's stock.[12]  Sinha served as a director on the Eidos Board from December 2019 through the closing of the Transaction.[13]  During that time, she also served as the Chief Scientific Officer of Eidos and BridgeBio.[14]

### B.    Early History of Eidos

Eidos was founded in 2013.  In 2017, BridgeBio invested $27 million in Eidos in exchange for a majority equity stake.[15]  In 2018, AG10 continued to progress

---

[8] *Id.* ¶ 4.  The three other members of the Eidos Board, William Lis, Duke Rohlen, and Susan Hooper, were outside directors.  *Id.*  They are not named as defendants in this action.

[9] *Id.* ¶¶ 28–30.

[10] *Id.* ¶ 28.

[11] *Id.* ¶ 29.

[12] *Id.* ¶¶ 3–4.

[13] *Id.* ¶ 30.

[14] *Id.* ¶ 4.

[15] *Id.*

through the initial stages of testing in order to obtain approval from the U.S. Food and Drug Administration and began Phase II trials in early May 2018.[16] One month later, BridgeBio sold a minority stake in Eidos in an initial public offering (the

<hr />

[16] *Id.* ¶ 38 n.11. Before a new drug can be marketed for human use, the U.S. Food and Drug Administration (the "FDA") must approve it. The road to approval is arduous and few new drugs ever make it from initial clinical stages to market. *See In re Vaxart, Inc. S'holder Litig.*, 2022 WL 1837452, at *16 n.161 (Del. Ch. June 3, 2022). The sponsor of a drug begins by conducting laboratory and animal testing. If the results of that testing are satisfactory, the company will submit an Investigational New Drug ("IND") Application to the FDA, seeking permission to begin human clinical trials. If the IND is approved, the drug enters into a three-phase investigatory testing process. 21 C.F.R. § 312.21. Phase I involves a "closely monitored, relatively small study (twenty to eighty volunteers) to determine the safety of the drug and, if possible, early evidence of effectiveness." *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *2 (S.D. Ind. Jan. 4, 2016); *see* 21 C.F.R. § 312.21(a). Phase II utilizes controlled clinical studies with a few hundred patients to evaluate the effectiveness, side effects, and risks associated with the drug. 21 C.F.R. § 312.21(b). If preliminary evidence suggests that the drug is effective, the drug will move into Phase III. *Id.* § 312.21(c). Phase III studies are significantly larger, typically involving several hundred to several thousand subjects and "are intended to gather additional information about the drug's safety and efficacy." *Sapir v. Averback*, 2016 WL 554581, at *1 n.2 (D.N.J. Feb. 10, 2016).

If the drug passes each of these hurdles, the drug's sponsor will submit a New Drug Application ("NDA") to the FDA. 21 C.F.R. § 314.50. "An NDA is a compilation of materials that must include full reports of all clinical investigations, relevant nonclinical studies, and any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source." *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 476 (2013) (internal quotations omitted). The NDA must also include the proposed labeling of the drug and information supporting a finding that the drug's benefits exceed its risks. *Id.* (citing 21 C.F.R. § 314.50(d)(5)(viii); § 314.50(c)(2)(ix)). "If the application is not sufficient, the FDA will refuse to file it. If the NDA is accepted, the FDA may refer the application to an advisory committee of outside experts. . . . After making its decision, the FDA sends one of three letters: an approval letter, a not approvable letter, or an approvable letter." *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003). The drug will be approved only if the FDA determines it is "safe for use" under "the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d).

"IPO"), reducing BridgeBio's majority ownership to 54.8%.[17]  Nine months later, AG10 began a Phase III clinical trial for treatment of a particular type of ATTR, which, if successful, would be the last step before seeking regulatory approval.[18]

These rapid clinical successes set the stage for a sale of Eidos.  On August 8, 2019, just fourteen months after the IPO, BridgeBio offered to acquire Eidos's minority shares at an exchange rate of 1.30 BridgeBio shares for each Eidos share.[19] In presenting its proposal, BridgeBio indicated that it intended to retain control of Eidos and was unwilling to participate in any alternative transactions.[20]  On August 11, 2019, the Eidos Board formed a special committee, consisting of directors William Lis and Rajeev Shah, to evaluate BridgeBio's offer (the "2019 Special Committee").[21]

The 2019 Special Committee hired Centerview Partners LLC ("Centerview") as a financial adviser, Cravath, Swaine & Moore LLP ("Cravath") as a legal adviser, and Navigant Consulting, Inc. as an industry consultant.[22]  After deliberation, the committee rejected the August 2019 proposal as inadequate to compensate minority

---

[17] Compl. ¶ 36.

[18] *Id.* ¶ 38.

[19] *Id.* ¶ 41.

[20] *Id.*

[21] *Id.* ¶ 42.  Shah resigned from the board in August 2020.  *Id.* ¶ 42 n.14.

[22] *Id.*

6

stockholders for their stakes in the Company.[23]  Negotiations between the Special Committee and BridgeBio continued through September and early October. BridgeBio and the committee could not agree on merger terms, and on October 14, 2019, BridgeBio publicly announced it was no longer pursuing a merger with Eidos.[24]  Thereafter, the 2019 Special Committee was dissolved.[25]

In the summer of 2020, GSK set its sights on Eidos.  After exchanging confidential information with Eidos, on August 16, 2020, GSK proposed a licensing and collaboration agreement with the Company.[26]  The proposal contemplated $1 billion in upfront payments to Eidos and up to $700 million in milestone payments in exchange for Eidos's continued funding of all research and development activities.[27]  The proposal specified terms for a commercialization cost and profit sharing arrangement upon AG10 reaching the market.[28]  At the time, Eidos had a market capitalization of around $1.6 million.[29]  The proposal was immediately shared with the Eidos Board.[30]

---

[23] *Id.* ¶ 43.

[24] *Id.* ¶ 44.

[25] *Id.*

[26] *Id.* ¶¶ 50–51.

[27] *Id.* ¶ 6.

[28] *Id.*

[29] *Id.*

[30] Defs.' Ex. 36 (hereinafter, "Proxy") 71.

According to the joint proxy statement disseminated to and soliciting votes of the Eidos and BridgeBio stockholders in favor of the transactions necessary to effectuate the terms of the Merger Agreement (the "Proxy"), the Eidos Board rejected the GSK proposal shortly after receiving it:

> On August 18, 2020, the Eidos board held a videoconference meeting during which, among other things, the Eidos board discussed the August 16 collaboration proposal. Following such discussion, the Eidos board unanimously determined that the August 16 collaboration proposal was not in the best interests of Eidos and its stockholders and determined not to pursue the August 16 collaboration proposal. Dr. Kumar, on behalf of BridgeBio, informed the Eidos board that while no decision had been made, BridgeBio management was preliminarily considering potential alternatives with respect to Eidos, including the possibility of proposing a potential transaction, and that any potential transaction would be conditioned on approval by a special committee of independent directors and would be subject to a non-waivable condition requiring approval by the holders of a majority of the aggregate voting power represented by shares of Eidos common stock that are not owned by BridgeBio.[31]

The GSK proposal is not explicitly mentioned in the minutes of the August 18, 2020 Board meeting.[32] The minutes do describe that the board meeting was adjourned temporarily for a meeting of the compensation committee, following which the executive session was reconvened and "[a] variety of additional topics were discussed."[33]

---

[31] Proxy at 70–71.

[32] *See* Defs.' Ex. 19.

[33] Defs.' Ex. 19 at EIDOS_SECTION 220_00001390.

## C. The Special Committee Process

At an August 24, 2020 Eidos Board meeting, Kumar formally disclosed[34] BridgeBio's renewed interest in acquiring Eidos.[35] BridgeBio's proposal was "conditioned on approval of a special committee of independent directors of the Company and approval of a majority of the outstanding shares of the Company not held by BridgeBio."[36] In response, at that same meeting, the Board created another special committee. Its members were Lis, who had served on the 2019 Special Committee, and two recently appointed directors—Susan Hooper and Duke Rohlen (the "Special Committee"). The committee was granted authority to retain advisers and to consider any transaction proposal and any alternatives to any such proposal.[37] The Special Committee engaged outside advisers Centerview and Guidehouse Inc. ("Guidehouse") to evaluate forecasts and assumptions for the proposed business combination.[38] The Special Committee also retained Cravath as its legal adviser. On the other side of the table, BridgeBio enlisted Goldman Sachs and JP Morgan as its financial advisers, which teamed up with BridgeBio's lawyers from Skadden,

---

[34] Plaintiff contends that Kumar had begun discussing BridgeBio's renewed interest in acquiring Eidos with fellow directors by August 19, 2020. Compl. ¶¶ 25–26.

[35] *Id.* at ¶ 59.

[36] Defs.' Ex. 1 at EIDOS_SECTION 220_00000094; Compl. ¶¶ 13, 64.

[37] Compl. ¶ 64.

[38] *Id.* Guidehouse had recently acquired Navigant, the 2019 Special Committee's industry adviser.

Arps, Slate, Meagher & Flom LLP ("Skadden").[39]  BridgeBio's advisers relayed to the Special Committee BridgeBio's desire to avoid public disclosure of the acquisition process.[40]

The Special Committee's advisers began to engage with BridgeBio's advisers in late August, reporting their preliminary conversation to the Special Committee at a September 1, 2020 meeting.[41]  In a September 2, 2020 Special Committee meeting, Rohlen resigned from the committee after disclosing that he owned 17,500 shares of BridgeBio common stock and had relationships with members of BridgeBio's board of directors.[42]  Rohlen's resignation left Hooper and Lis as the sole members of the Special Committee.[43]  The Special Committee met again on September 15, 2020 to discuss the value of Eidos and its future prospects.[44]  At this meeting, Centerview advised the committee in favor of a cash offer given the "volatility and limited

---

[39] *Id.* ¶ 65.

[40] *Id.* ("At the Special Committee's September 1, 2020 meeting, a Cravath representative detailed an August 31, 2020 call with J.P. Morgan, one of BridgeBio's financial advisors, during which J.P. Morgan stated that BridgeBio wanted to explore a possible strategic transaction with the Company.  Importantly, Goldman Sachs, another advisor to BridgeBio, asked on behalf of BridgeBio that this second acquisition process not be publicly revealed.").

[41] *Id.*

[42] *Id.* ¶ 66.

[43] *Id.*

[44] *Id.* ¶ 67.

trading history of BridgeBio's common stock."[45] Centerview also emphasized the importance of information regarding the "the Company's intrinsic value and the intrinsic value of any entity offering stock consideration" in order to evaluate a potential transaction.[46]

Given the concerns regarding BridgeBio's volatile stock price, the Special Committee asked if BridgeBio was willing to sell its controlling stake in Eidos to a third party.[47] BridgeBio responded that it had no interest in selling its stake,[48] which prompted the Special Committee to conclude on September 30, 2020 "that it was pointless to reach out to any potential third-party buyers as it was 'unlikely that any potential interested counterparty would pursue an acquisition of the Company at this time.'"[49] On October 1, 2020, Centerview presented the Special Committee with

---

[45] *Id.*

[46] *Id.*

[47] *Id.* ¶ 70.

[48] *Id.*

[49] *Id.* ¶ 71 (quoting Minutes of the September 30, 2020 Special Committee Meeting (EIDOS_SECTION 220_000000818–820)). In its Proxy, the Company explains:

> The Eidos special committee . . . determined that it would not be advisable to pursue any outreach to potential third party buyers because, in light of BridgeBio's position, Centerview's prior outreach to potential counterparties on behalf of the 2019 special committee, the fact that no third parties had submitted an offer to acquire Eidos after the August 2019 proposal had been publicly announced or after negotiations with BridgeBio had terminated in October 2019, and the fact that Eidos' ongoing business development efforts had not resulted in any proposals that were acceptable to the Eidos board, it

---

preliminary financial analyses.[50]  The Special Committee determined that it would consider an offer from BridgeBio if it reflected a substantially higher price than Eidos's current trading price.[51]  Centerview conveyed the committee's position to BridgeBio's financial advisers.[52]

On October 2, 2020, BridgeBio offered to acquire all Eidos stock that it did not already own for either 1.55 shares of BridgeBio common stock or $61.38 in cash.[53]  BridgeBio concurrently delivered a draft merger agreement.[54]  BridgeBio reiterated its unwillingness to sell its shares of Eidos to a third party or participate in an auction process.[55]  The Special Committee met that same day and rejected the offer as inadequate based on the relative valuations of the companies.[56]

On October 3, 2020, BridgeBio increased its offer to 1.69 BridgeBio shares per Eidos share, or an equivalent amount in cash, with a maximum cash expenditure

---

was unlikely that any potentially interested counterparty would pursue an acquisition of Eidos at this time.

Proxy at 75.

[50] Compl. ¶ 74.

[51] *Id.*

[52] *Id.*

[53] *Id.* ¶ 75.

[54] Proxy at 77.

[55] *Id.*

[56] Compl. ¶ 76.

of $150 million.[57] The Special Committee rejected BridgeBio's new offer, finding that the revised proposal still undervalued the Company.[58] Centerview informed BridgeBio's advisers that "BridgeBio would need to substantially increase its offer in order for [the Special Committee] to recommend approval of a transaction between BridgeBio and Eidos."[59]

Later that day, BridgeBio increased its offer to 1.77 BridgeBio shares per Eidos share or $70.09 per share, with the same $150 million cash cap.[60] The Special Committee rejected BridgeBio's new proposal.[61] After this third rejection, Centerview advised the committee that BridgeBio "was unlikely to make a fourth offer without receiving any counteroffer."[62] The Special Committee then authorized a counteroffer of 1.88 shares of BridgeBio common stock per Eidos share or an equivalent amount of cash, roughly $74.45 per share.[63] BridgeBio responded with its "best and final" offer of 1.85 shares of BridgeBio common stock or $73.26 cash per share, up to a cap of $175 million.[64] According to the Proxy, this offer "implied

---

[57] *Id.*

[58] *Id.* ¶ 77.

[59] *Id.*; Proxy at 78.

[60] Compl. ¶ 78.

[61] *Id.* ¶ 79.

[62] *Id.* (internal quotations omitted).

[63] *Id.*

[64] *Id.* ¶ 80.

a total Eidos equity value on a fully-diluted basis of $2.9 billion (representing $1.1 billion of value to the minority stockholders of Eidos)."[65] The Special Committee convened its third meeting of the day and determined that this offer "represented the highest proposal that BridgeBio was likely to offer."[66] The Special Committee decided that it would recommend the Transaction to the full Eidos Board if Centerview could deliver a fairness opinion as to the merger consideration and the committee could otherwise negotiate acceptable transaction terms.[67]

The Special Committee met twice on October 4, 2020 to receive updates from Centerview and from Cravath, which had been exchanging drafts of a merger agreement with Skadden. Centerview rendered an oral opinion to the Special Committee that, as of that date, the merger consideration to be paid to the minority Eidos stockholders was fair from a financial point of view (the "Fairness Opinion").[68] The Special Committee determined at its second October 4 meeting that it was fair to and in the best interest of Eidos and its stockholders to enter into the merger agreement and recommended the Transaction to the Eidos Board.[69]

---

[65] Proxy at 79.

[66] Compl. ¶ 81 (quoting Defs.' Ex. 5 at EIDOS_SECTION 220_00000829–830).

[67] Compl. ¶ 81.

[68] *Id.* ¶ 82. Centerview confirmed its Fairness Opinion in writing later that day. *See* Proxy at 80.

[69] Compl. ¶ 82.

14

Later that day, the Special Committee presented its recommendation to the Eidos Board.[70] Kumar was not present at this meeting.[71] Directors Satvat and Sinha recused themselves from any discussion or vote on the Transaction due to their positions with BridgeBio.[72] The three remaining directors, Hooper, Lis, and Rohlen, determined that the Transaction was fair to and in the best interest of Eidos and its stockholders and voted to approve it.[73] On October 5, 2020, Eidos and BridgeBio executed the merger agreement (the "Merger Agreement") and announced the Transaction that morning.[74]

### D. GSK Reappears

On November 15, 2020, GSK's financial adviser contacted a member of the BridgeBio board to convey GSK's interest in buying all of Eidos's outstanding equity, including BridgeBio's stake, at a substantial premium to the terms of the Merger Agreement.[75] Kumar and other members of the BridgeBio board contacted GSK to communicate BridgeBio's refusal to sell its stake.[76] GSK was undeterred.

---

[70] *Id.* ¶ 82; Proxy at 81.

[71] Proxy at 81.

[72] *Id.*

[73] *Id.*

[74] Compl. ¶¶ 15, 83.

[75] *Id.* ¶ 87; Proxy at 81.

[76] Compl. ¶ 87.

On November 23, 2020, GSK told Cravath that GSK intended to submit a buyout proposal to the Special Committee.[77] That same day, GSK sent letters to both Eidos and BridgeBio expressing surprise that Eidos declined to engage with GSK to explore "whether [GSK] would be prepared to offer significantly higher value for Eidos shareholders" and proposing an acquisition of all outstanding shares of Eidos for $120 per share in cash, to be finalized within two weeks.[78] The letter also conveyed that, "[i]n the unfortunate event that BridgeBio is not willing to align with the other Eidos stockholders, [GSK] would be willing to explore an acquisition of the Eidos shares held by Eidos stockholders other than BridgeBio at a significant premium to the BridgeBio transaction."[79]

After meeting with its advisers, the Special Committee concluded that the GSK proposal would be more financially favorable to Eidos stockholders than the Transaction and decided to respond.[80] The BridgeBio board of directors also met with its advisers on November 23, unanimously reaffirming BridgeBio's disinterest in selling its Eidos stock, which it contended rendered the GSK proposal outside of the Agreement's definition of a "Company Superior Proposal."[81] The BridgeBio

---

[77] *Id.* ¶ 88.

[78] *Id.* at ¶¶ 89–90 (quoting Defs.' Ex. 34 at EIDOS_SECTION 220_00003749–3751).

[79] Compl. ¶ 90 (quoting Defs.' Ex. 34 at EIDOS_SECTION 220_00003749–3751).

[80] Compl. ¶ 92.

[81] *Id.* ¶¶ 93–95.

16

board, through Kumar, communicated this to the Special Committee.[82]  The relevant

provisions of the Merger Agreement on this point are as follows:

> "Company Acquisition Proposal" means any inquiry, proposal, indication of interest or offer from any Person . . . other than the Company, [or] Parent, . . . with respect to any (a) merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, spin-off, share exchange, business combination, purchase or similar transaction involving the Company which if consummated would result in any Person  . . . becoming the beneficial owner, directly or indirectly, in one or a series of related transactions, of fifteen percent (15%) or more of the total voting power or of any class of equity securities of the Company or (b) direct or indirect acquisition, in one or a series of related transactions, of fifteen percent (15%) or more of the total voting power or of any class of equity securities of the Company, or fifteen percent (15%) or more of the assets of the Company (on a consolidated basis), in each case, other than the transactions contemplated by this Agreement.
> . . .
> "Company Superior Proposal" means an unsolicited bona fide written Company Acquisition Proposal that would result in any Person (other than the Company, Parent, Merger Sub, Merger Sub II or any controlled Affiliate thereof) becoming the beneficial owner, directly or indirectly, of fifty percent (50%) or more of the assets (on a consolidated basis) or fifty percent (50%) or more of the total voting power of the equity securities of the Company (or of the surviving entity in a merger involving the Company or the resulting direct or indirect parent of the Company or such surviving entity) that the Company Board (acting upon the recommendation of the Special Committee) or the Special Committee has determined in its good faith judgment, after consultation with its outside financial advisor(s) and outside legal counsel (a) would result in a transaction that, if consummated, would be more favorable to the stockholders of the Company (other than Parent and its Affiliates) from a financial point of view than the Mergers . . . and (b) is reasonably capable of being consummated on the terms so proposed.[83]

---

[82] *Id.*

[83] Proxy at A-38, A-64.

17

Section 7.2 of the Merger Agreement prevents Eidos and its representatives from seeking alternative transactions, but allows them to provide information to an outsider who makes a unsolicited Company Acquisition Proposal before stockholder approvals are obtained, provided that Eidos promptly makes any information provided to the unsolicited bidder known to BridgeBio.[84] It also provides that the Special Committee can engage with the unsolicited bidder "if and only to the extent that" failure to engage with the unsolicited bidder would breach the Special Committee's or Eidos Board's fiduciary duties and the unsolicited "Company Acquisition Proposal either constitutes a Company Superior Proposal or could reasonably be expected to result in a Company Superior Proposal."[85]

The Special Committee met again on November 24, 2020 to discuss its predicament and recognized a possibility, based on discussions that occurred during the 2019 Special Committee process, that GSK may be able to make an offer so high that BridgeBio would consider it.[86] The Special Committee members concluded that the GSK proposal could result in a Company Superior Proposal under the Agreement and that a failure to engage with GSK would be inconsistent with their fiduciary duties.[87] The committee directed Cravath to ask GSK whether it would increase its

---

[84] *Id.* at A-37

[85] *Id.* at A-38.

[86] Compl. ¶ 96.

[87] *Id.*; Proxy at 83.

18

offer as to all shares, what its proposed terms were for acquiring only the minority shares, and how much due diligence GSK would need to consummate a transaction.[88] The Special Committee then communicated its decision to the BridgeBio board.[89]

On November 27, 2020, GSK informed the Special Committee's advisers that it was willing to provide a "substantial premium" to acquire the minority shares of Eidos if BridgeBio was willing to provide "certain fairly standard 'governance and other rights.'"[90] The Special Committee categorized these requests as reasonable, but noted that they would require the approval of the Eidos and BridgeBio boards.[91]

---

[88] Proxy at 83.

[89] Compl. ¶ 97.

[90] *Id.* ¶ 98 (quoting Proxy at 83). Specifically, GSK requested: (i) the right to appoint two directors to the Eidos Board, and to appoint two additional directors jointly with BridgeBio, (ii) anti-dilution rights, (iii) information rights if Eidos was no longer a public company, (iv) a requirement that any transaction acoramidis technology or intellectual property be approved by a special committee of independent directors of the Eidos Board and that GSK be allowed to participate in the process with respect to any such transaction, (v) a requirement that any transaction proposed by BridgeBio, including a buy-out of minority stockholders or a transfer of material assets of Eidos to itself, be approved by a special committee of independent directors of the Eidos Board and by the vote of a majority of the minority shares, and (vi) a requirement that the Eidos Board unanimously approve any capital allocations exceeding $500 million. Proxy at 83–84.

[91] Compl. ¶ 99.

On November 29, 2020, Kumar asked the members of the Special Committee for permission to speak directly with GSK. Kumar said that his intent was "to better understand [GSK's] plans for the asset and intended road forward."[92]

On November 30, 2020, GSK informed the Special Committee that it was prepared to pay more than $120 per share if it could engage directly with BridgeBio to explore a transaction at a higher price. GSK also stated that it was prepared to pay $110 per share for the public minority shares.[93] GSK also separately raised the prospect of a possible collaboration agreement relating to AG10. Later that day, the Special Committee permitted GSK to speak directly with BridgeBio.[94] The next day, BridgeBio affirmed its lack of interest in selling its stake in Eidos.[95]

During a phone call the next day with Kumar, a GSK representative requested that BridgeBio identify a price at which it would support a GSK acquisition of Eidos.[96] Kumar responded that BridgeBio was unwilling to sell its interest in Eidos regardless of the price.[97] In a subsequent letter to the Special Committee, BridgeBio

---

[92] *Id.* ¶ 100.

[93] *Id.* ¶ 101.

[94] *Id.* ¶ 102. The Special Committee asked that BridgeBio keep the Special Committee "reasonably informed, on a reasonably current basis, of the status of any such discussions or negotiations." *Id.* (internal citations omitted).

[95] *Id.* ¶ 103.

[96] *Id.* ¶ 104.

[97] *Id.*

expressed a willingness to have further discussions with GSK only if a member or representative of the Special Committee also participated.[98]   That discussion occurred during a December 9, 2020 videoconference, at which GSK presented its capabilities and proposed a collaboration with an upfront payment of $2.2 to $2.4 billion.[99]   The proposal contemplated that GSK would book all revenue from acoramidis, that the parties would share profit 50/50 domestically, and the collaboration efforts would be overseen by a joint steering committee that GSK would control.[100]

After its December 9 videoconference with GSK and BridgeBio, the Special Committee asked BridgeBio if would (1) grant the governance rights that GSK had requested to allow the minority stockholders to receive an offer to sell their stock to GSK for $110 per share; (2) sell its shares in Eidos to GSK in a transaction whereby all stockholders could obtain more than $120 per share; or (3) increase the consideration BridgeBio was paying under the Merger Agreement.[101]   BridgeBio replied in the negative to all three questions.  It attributed its unwillingness to budge to GSK's unsatisfactory answers regarding its plans for acoramidis, determining that the collaboration proposal was not attractive, and that GSK was not a suitable

---

[98] *Id.* ¶¶ 105–06.

[99] *Id.* ¶ 107; Proxy at 85.

[100] Proxy at 85.

[101] Compl. ¶ 108; Proxy at 85.

collaboration partner for AG10.[102]  The Special Committee relayed BridgeBio's position to GSK.[103]

### E.    GSK Walks Away After Amended Disclosures

On December 11, 2020, BridgeBio filed Amendment No. 1 to its Form S-4 with the SEC, containing an amended joint proxy statement (the "Amended S-4").[104] The Amended S-4 disclosed GSK's proposals and interactions with the Special Committee and BridgeBio following the announcement of the Transaction.  GSK was referred to only as "Company C."  The Amended S-4 represented that the Special Committee continued to support the Transaction with BridgeBio.[105]  It also included BridgeBio's characterization of GSK as "[an un]suitable collaboration partner for acoramidis" because of its "lack of presence in cardiovascular and rare genetic diseases."[106]  That same day, BridgeBio sent a letter to GSK stating that BridgeBio was not interested in pursuing any of GSK's proposals.

GSK did not take kindly to the filing of the Amended S-4 or some of its disclosures.  After reviewing the Amended S-4 and BridgeBio's December 11 letter,

---

[102] Proxy at 85–86.  Specifically, BridgeBio's board took issue with GSK's "plans with respect to development, life cycle management, commercial rebating, commercial network design and pharmacy benefit issues for Medicare." *Id.* at 86.

[103] Compl. ¶ 108; Proxy at 86.

[104] BridgeBio Pharma, Inc., Amended Registration Statement (Form S-4/A) (Dec. 11, 2020).

[105] Compl. ¶ 111.

[106] Proxy at 85–86.

GSK responded with a letter to the Special Committee. GSK indicated its surprise at the filing of the Amended S-4, since GSK understood that the Special Committee had encouraged GSK to submit a revised proposal, which GSK was preparing to send that same morning.[107] GSK wrote that it perceived that the Special Committee had "apparently decided to discontinue discussions with [GSK]."[108] GSK also took issue with BridgeBio's characterization of GSK in the Amended S-4 as "'a not suitable collaboration partner for acoramidis' given GSK's unsurpassed global platform and our senior team's many years of experience developing and commercializing some of the most successful cardiovascular and precision medicines."[109] The Special Committee responded with a letter indicating that it was willing to field additional proposals from GSK.[110] GSK did not respond with a revised proposal.

Also on December 11, 2020, *Bloomberg* published an article disclosing GSK's previously undisclosed $120 per share offer and a willingness to go higher.[111]

---

[107] Compl. ¶ 113.

[108] *Id.* ¶ 114.

[109] *Id.* ¶¶ 112–15 (citing Pl.'s Ex. C. at EIDOS_SECTION 220_00001182).

[110] Compl. ¶ 116.

[111] Defs.' Ex. 31.

The article also identified GSK as the unidentified "Company C" in the Amended S-4.[112]

Eidos and BridgeBio filed the definitive Proxy on December 15, 2020.[113] The Proxy did not identify GSK by name and did not include any of the events that occurred after December 9, 2020. Thereafter, however, on January 12, 2021, Eidos filed a Form 8-K with the SEC containing supplemental disclosures to the Proxy (the "Supplement").[114] Some of those disclosures were made in response to litigation in other jurisdictions challenging the proposed Transaction.[115] Pertinent to the pending motion, the Supplement provided additional information surrounding the communications with GSK after December 9, 2020, which were not included in the Proxy. The Supplement disclosed that the Special Committee had indicated to GSK in its December 13, 2020 letter that the committee was willing to engage in further discussions with GSK. The Supplement also described a December 23, 2020 meeting of the Special Committee, which noted that GSK had not submitted any

---

[112] *Id.*

[113] Compl. ¶ 6 n.1.

[114] *See* Eidos Therapeutics, Inc., Current Report (Form 8-K) (Jan. 12, 2021) ("Supplement"). BridgeBio also filed a Form 8-K on January 12 which contained substantially similar information. BridgeBio Pharma, Inc., Current Report (Form 8-K) (Jan. 12, 2021). The court can take judicial notice of these SEC filings as they are not subject to reasonable dispute under Delaware Rule of Evidence 201. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, (Del. 2006).

[115] Supplement. Among other things, the supplemental disclosures provided additional detail to Centerview's analyses presented to the Special Committee.

further proposals following its December 11, 2020 letter. At that meeting, the Special Committee:

> determined that the best available alternative for Eidos and its stockholders (other than BridgeBio and its subsidiaries) was the transactions contemplated by the merger agreement due to the absence of an actionable offer from Company C and the risks of remaining a standalone company as Eidos approaches a critical phase in clinical development and commercial preparedness, as well as the significant value and other potential benefits that the transactions with BridgeBio contemplated by the merger agreement would provide to Eidos and its stockholders (other than BridgeBio and its subsidiaries). The Eidos special committee also noted that entering into a collaboration agreement with Company C would not provide increased value to Eidos stockholders (other than BridgeBio and its subsidiaries) compared to the merger agreement.[116]

## F.    The Stockholder Vote

On January 19, 2021, a majority of Eidos's minority stockholders voted to approve the Transaction.[117] Of the 10,903,004 shares voted, 10,866,822 or 99.67% of non-BridgeBio affiliated shares and approximately 80% of all outstanding minority shares, voted to approve the merger.[118] The Transaction closed on January 26, 2021.[119]

---

[116] *Id.*

[117] Compl. ¶ 118.

[118] Eidos Therapeutics, Inc., Current Report (Form 8-K) (Jan. 20, 2021).

[119] Compl. ¶ 143.

### G. Procedural History

On November 26, 2021, Plaintiff filed its verified stockholder class action complaint (the "Complaint"). Count I alleges BridgeBio breached its fiduciary duties to Plaintiff and the minority stockholders in its capacity as a controlling stockholder of Eidos. Count II alleges the Individual Defendants, in their capacities as directors (and in the case of Kumar and Sinha also as officers), breached their fiduciary duties to Plaintiff and the minority stockholders. Defendants moved to dismiss the Complaint on February 4, 2022.[120] After briefing, the court heard argument on the motion on September 19, 2022.[121]

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint for failure to state a claim under Court of Chancery Rule 12(b)(6). The standard for a motion to dismiss is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal quotations and citations omitted). Although these pleading standards are minimal, *Central*

---

[120] Dkt. 6.

[121] Dkt. 24.

*Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011), they have reasonable limits. "[A] trial court is required to accept only those reasonable inferences that logically flow from the face of the complaint and is not required to accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citation omitted).

In preparing the Complaint, Plaintiff utilized documents that the Company produced in response to Plaintiff's demand to inspect books and records pursuant to 8 *Del. C.* § 220.[122] In resolving the books and records demand, the parties entered into an Agreement Governing the Inspection of Confidential Material whereby "all documents produced by the Company in response to the Demand shall be deemed incorporated by reference into [the] complaint or pleading in accordance with Delaware law."[123]

Notwithstanding their arrangement, the parties may not rely on private agreement to change the pleading standard at the motion to dismiss stage. "The incorporation-by-reference doctrine does not enable a court to weigh evidence on a

---

[122] Plaintiff filed a complaint to compel inspection. *See Smart Local Unions and Councils Pension Fund v. Eidos Therapeutics, Inc.*, C.A. No. 2021-0060-PAF (Del. Ch.). The case was resolved without any substantive litigation, and a stipulation of dismissal was filed on December 1, 2021. *Id.* at Dkt. 13.

[123] Defs.' Ex. 35.

motion to dismiss.  It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Voigt v. Metcalf*, 2020 WL 614999, at \*9 (Del. Ch. Feb. 10, 2020).

## A.    The Presumptive Standard of Review

Under Delaware law, a controlling stockholder owes fiduciary duties to the Company and its minority stockholders.  *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994).  A stockholder owning "more than 50% of the voting power of a corporation" will be deemed a "controller" under Delaware law. *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).  At all relevant times, BridgeBio controlled more than 50% of the voting power of Eidos's outstanding voting stock.  Defendants do not dispute BridgeBio's status as a controlling stockholder.

When a controlling stockholder acquires the minority shares that it does not already own, the transaction is presumptively subject to the entire fairness standard. *Kahn*, 638 A.2d at 1115.  Under that standard, the controlling stockholder has the burden of demonstrating that the transaction was the product of fair dealing and resulted in a fair price.  *Weinberger v. U.O.P., Inc.*, 457 A.2d 701, 710 (Del. 1985).

28

In *MFW*, the Delaware Supreme Court approved a framework that would alter the standard of review in a conflicted controlling stockholder transaction from entire fairness to the more lenient business judgment standard. Under *MFW*, the transaction will be subject the business judgment standard if the defendants can establish that:

> (i) the controller condition[ed] the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee [was] independent; (iii) the Special Committee [was] empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee [met] its duty of care in negotiating a fair price; (v) the vote of the minority [was] informed; and (vi) there [was] no coercion of the minority.

*MFW*, 88 A.3d at 645. These conditions must be implemented before substantive economic negotiations begin. *Flood v. Synutra Int'l, Inc.*, 195 A.3d 754, 763 (Del. 2018). A claim may be dismissed at the pleadings stage if the plaintiff fails to allege facts sufficient to call into question compliance with the *MFW* conditions. *Id.* On the other hand, "'[i]f a plaintiff can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist,' the plaintiff would state a claim for relief and be entitled to conduct discovery." *In re HomeFed Corp. S'holder Litig.*, 2020 WL 3960335, at *9 (Del. Ch. July 13, 2020) (quoting *MFW*, 88 A.3d at 645).

## B. Plaintiff's Policy Argument Against *MFW* Is Without Merit.

Plaintiff makes a threshold argument that *MFW* is inapplicable in this case, even if all of its elements can be satisfied. In the Plaintiff's view, *MFW* cannot apply where a competing bidder makes an offer that is substantially higher than that offered by the controller and the controller refuses to sell control.[124] Essentially, Plaintiff cobbles together quotations from opinions applying the *MFW* framework—some dismissing the action and some sustaining the claims[125]—and posits that "*MFW* was never intended to apply to the facts of this case."[126] This argument is without merit.

Plaintiff's policy argument fails because the facts of this case do not fall outside the *MFW* framework. First, a controlling stockholder is not required to accept a sale to a third party or to give up its control, and its stated refusal to do so does not preclude review under the *MFW* framework. The *MFW* framework was derived in a case were the controller had "no interest" in selling its shares to a third-party and would not "vote in favor of any alternative" transaction. *MFW*, 88 A.3d at 650; *see In re Synutra Int'l, Inc.*, 2018 WL 705702, at *3 (Del. Ch. Feb. 2, 2018)

---

[124] Pl.'s Ans. Br. 21–25.

[125] *Id*. at 22–23. Each of those cases applied the elements of *MFW*, with varying results. *See, e.g.*, *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *18 (Del. Ch. Dec. 11, 2017) (applying *MFW* to a reclassification and granting motion to dismiss); *Flood*, 195 A.3d at 769 (affirming dismissal of a challenge to a take-private transaction); *In re Pivotal Software, Inc. S'holders' Litig.*, C.A. No. 2020-0440-KSJM, at *30 (Del. Ch. June 29, 2021) (TRANSCRIPT) (denying motion to dismiss challenge to a going-private merger because *MFW* condition was not satisfied).

[126] Pl.'s Ans. Br. 25.

(ORDER) (applying the *MFW* framework where the controller "made clear, at the outset, in its Initial Letter, that it would not participate in a competing bid"), *aff'd sub nom. Flood*, 195 A.3d at 756. Second, *MFW* may be applied even where a competing bidder emerges with a higher offer. *See*, *e.g.*, *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *12–17 (Del. Ch. Oct. 10, 2016) (applying *MFW* framework where a third party offered to acquire the company at a premium to the controller's offer).

Plaintiff offers no legal authority that would foreclose the Defendants from attempting to avail themselves of the *MFW* framework in this case. *MFW* is a clear precedent of the Delaware Supreme Court that this court is required to follow. Accordingly, Plaintiff's challenge to the Transaction will be tested against the elements of that established framework.

## C. Application of the *MFW* Framework

Plaintiff concedes that BridgeBio conditioned its offer on the approval of both an independent special committee and a majority of the minority stockholders. Thus, the first two elements of the *MFW* framework are not contested.

## D. The Special Committee Was Fully Empowered to Select Advisers and to Reject the Transaction.

Under the third prong of the *MFW* framework, the Special Committee must be empowered to select its own advisers and to definitively reject the transaction. *In re Match Gp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *21 (Del. Ch. Sept. 1, 2022).

31

A special committee must be able to select independent advisers, meaning that the adviser must work for the committee and have the committee's interests foremost in mind, rather than being chosen by, co-opted by, or harboring conflicting incentives to support the controller. *Id.* Plaintiff does not allege or argue that Cravath, Centerview, or Guidehouse were conflicted.

The Special Committee must also have the power to say no. "It must be apparent from the inception of negotiations that the controlling stockholder 'cannot bypass the special committee's ability to say no.'" *Id.* at *22 (quoting *Salladay v. Lev*, 2020 WL 954032, at *10 (Del. Ch. Feb. 27, 2020)). "The power to say 'no' is blunted if the special committee does not have accurate information, if the committee is facing an ultimatum from the controller, or [is] otherwise threatened." *Match Gp.*, 2022 WL 3970159, at *22 (internal citations omitted).

It is not reasonably conceivable from the allegations of the Complaint that the Special Committee lacked accurate information or faced an ultimatum or threat from BridgeBio. The Plaintiff does not allege that the Special Committee lacked the ability to reject BridgeBio's proposal. Indeed, the Special Committee rejected three proposals from BridgeBio before making a counterproposal.[127] Rather, Plaintiff argues that the Special Committee was not fully empowered because it negotiated a

---

[127] Compl. ¶¶ 76–77, 79.

32

transaction with BridgeBio instead of engaging GSK. This argument is not one directed to the empowerment of the Special Committee; instead, it focuses on the committee's exercise of its authority, or lack thereof. Plaintiff seems to concede that this argument is addressed to the committee's exercise of its duty of care.[128]

To be sure, BridgeBio's refusal to sell its controlling stake or support the GSK proposal does not mean that the Special Committee lacked the power to reject a transaction with the controller. *See In re MFW S'holders Litig.*, 67 A.3d 496, 508 (Del. Ch. 2013) (observing that the power to say no existed even though special committee lacked the "practical authority to market [the Company] to other buyers" because of controller's refusal to sell to other bidders), *aff'd sub nom. MFW*, 88 A.3d at 651, 654; *Synutra*, 2018 WL 705702, at *3 (rejecting argument that the controller's "refusal to support a competing bid . . . impaired the Special Committee's ability to say no").

Plaintiff's argument that the Special Committee did not exercise its leverage to maximize stockholder value,[129] "goes to the quality of the [Special] Committee's work, not whether it was adequately empowered." *Match Gp.*, 2022 WL 3970159,

---

[128] Plaintiff's brief does not contain a stand-alone argument challenging the empowerment of the Special Committee. Instead, it is contained in the section of the brief addressing the duty of care. *See* Pl.'s Ans. Br. 48 ("Plaintiff's Well-Pled Allegations Establish that the Special Committee Either Failed to Meet Its Duty of Care Or Was Not Properly Empowered").

[129] Pl.'s Ans. Br. 49–50.

at *23. The Plaintiff does not allege facts to create a reasonably conceivable challenge to the empowerment of the Special Committee.

### E. The Duty of Care

The *MFW* framework requires the Special Committee to "meet[] its duty of care in negotiating a fair price." *MFW*, 88 A.3d at 645. Under *MFW*, "the standard of review for measuring compliance with the duty of care is whether the complaint has alleged facts supporting a reasonably conceivable inference that the directors were grossly negligent." *Books-A-Million*, 2016 WL 5874974, *17. The gross negligence standard "is only satisfied by conduct that really requires recklessness." *Swomley v. Schlecht*, 2014 WL 4470947, at *21 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE); *accord Flood*, 195 A.3d at 757 n.6. "Disagreeing with the special committee's strategy is not a duty of care violation." *Flood*, 195 A.3d at 768 (cleaned up) (quoting *Swomley*, 2014 WL 4470947, at *21); *accord Franchi v. Firestone*, 2021 WL 5991886, at *6 (May 10, 2021) (ORDER). In *Flood*, the Delaware Supreme Court clarified that a plaintiff cannot "plead a duty of care violation . . . by questioning the sufficiency of the price." *Flood*, 195 A.3d at 768.

Plaintiff's due care challenge focuses on the Special Committee's and the Company's responses to GSK's proposals. Plaintiff argues the Special Committee breached its duty of care "by failing to meaningfully consider viable strategic

34

alternatives" from GSK or having become "disempowered" due to BridgeBio's "affirmatively inserting itself into the process."[130]

Plaintiff concedes that the Special Committee retained competent, independent legal, financial, and industry advisers in Cravath, Centerview, and Guidehouse, respectively. Plaintiff also acknowledges that the Special Committee met twenty-four times over the course of four months, including nine times after the signing of the Merger Agreement. Although the Plaintiff correctly observes that the satisfaction of one's fiduciary duties is not a box-ticking exercise, *see Flood*, 195 A.3d at 769 (Valihura, J., dissenting), the Complaint falls short of alleging facts creating a reasonably conceivable inference that the Special Committee was grossly negligent.

Plaintiff first argues that the Special Committee failed to consider GSK's August 16 collaboration proposal. But the Eidos Board had already unanimously rejected that proposal before the Special Committee had been created. Once created, the Special Committee and its advisers considered whether it should contact

---

[130] Pl.'s Ans. Br. 48. Plaintiff also argues that the members of the Special Committee breached their duties of care by agreeing to provisions of the Merger Agreement that limited their ability to withdraw their recommendation of the Transaction. *Id.* 50–51 (citing Compl. ¶ 85 n.58; Defs.' Ex. 36 at A-38, A-64). This argument is a disagreement with the Special Committee's tactics and strategy and does not implicate a breach of the duty of care. *See Flood*, 195 A.3d at 768 (Del. 2018) (holding that disagreement with the special committee's strategy is insufficient to establish a duty of care violation) (citing *Swomley*, 2014 WL 4470947, at *21); *accord Match Gp.*, 2022 WL 3970159, *23.

35

potential strategic buyers and decided not to do so after BridgeBio confirmed that it was not interested in selling to a third party.[131]

During the process, the Special Committee's advisers reported on its discussions with BridgeBio's advisers. The Special Committee received financial analyses from Centerview before entertaining a formal offer from BridgeBio.[132] BridgeBio presented its initial offer on October 2, 2020, offering an exchange ratio of 1.55 shares of BridgeBio common stock per Eidos share or $61.38 in cash.[133] The Special Committee rejected BridgeBio's initial offer and two subsequent offers before making a counterproposal. When BridgeBio delivered its "best and final" offer of 1.85 BridgeBio shares per Eidos share or $73.26 in cash,[134] the Special Committee, in consultation with its advisers, determined to recommend it to the full Board subject to negotiation of acceptable Merger Agreement terms and receipt of a fairness opinion from Centerview, which was later delivered.[135]

When GSK resurfaced on November 15, 2020 and offered to acquire the Company for $120 per share, the Special Committee met with its advisers to discuss the fiduciary duties of the committee members in light of the proposal. The Special

---

[131] Defs.' Exs. 3 & 4.

[132] *Id.*

[133] Compl. ¶ 75.

[134] *Id.* ¶¶ 76–81.

[135] *Id.* ¶ 81.

36

Committee members concluded that the GSK offer could reasonably be expected to result in a Company Superior Proposal and that failure to engage with GSK would be inconsistent with their fiduciary duties. The committee continued to explore with BridgeBio whether it would be interested in a sale to GSK. The committee also explored GSK's alternative proposal to acquire the publicly held shares at $110 per share. At the same time, the Special Committee arranged for BridgeBio and GSK to meet to discuss GSK's proposals, including a potential collaboration agreement. Even after BridgeBio balked at GSK's proposals, leading GSK to voice its displeasure with the representations in the Amended S-4, the Special Committee indicated to GSK a willingness to continue their discussions.[136]

Plaintiff's disagreement with the Special Committee's tactics and strategy are insufficient to establish gross negligence. The allegations of the Complaint demonstrate that the Special Committee responded to GSK's proposals and pressed BridgeBio to reconsider its stated unwillingness to sell its Eidos stake to GSK.[137] Ultimately, BridgeBio refused to sell its Eidos shares, did not agree to GSK's governance proposals to facilitate GSK's acquisition of the minority public shares, and indicated its opposition to GSK's proposed collaboration agreement. The Special Committee's efforts to engage with GSK and to test BridgeBio's

---

[136] Defs.' Exs. 14 & 15.

[137] *See* Compl. ¶¶ 92, 96–97, 99, 101–02, 105–07.

unwillingness to sell "undercuts any possible inference of gross negligence." *Books-A-Million*, 2016 WL 5874974, at *18. That GSK's acquisition proposals reflected a substantial premium over the merger price does not establish a lack of due care. *Flood*, 195 A.3d at 768 ("[A] plaintiff can plead a due care violation only by showing that the Special Committee acted with gross negligence, not by questioning the sufficiency of the price.").

Plaintiff's argument that the Special Committee was either "not properly empowered" or "effectively disempowered" by BridgeBio[138] does not undermine the committee's exercise of due care. As noted above, the Complaint does not allege facts undermining the scope of the Special Committee's authority. Instead, Plaintiff claims that "BridgeBio effectively disempowered the Special Committee by affirmatively inserting itself into the process" after the November 23 GSK Proposal.[139] The Complaint does not contain well-pleaded facts showing that BridgeBio inserted itself or altered the Special Committee's powers. Rather, the documents incorporated by reference in the Complaint show that the Special Committee encouraged BridgeBio to engage with GSK.[140] Accordingly, the

---

[138] Pls.' Ans. Br. 48.

[139] *Id.*

[140] Defs.' Ex. 11.

Complaint fails to allege facts to support a reasonable inference that the Special Committee violated its duty of care.

## F. The Stockholder Vote Was Informed.

The fifth element of *MFW* requires that "the vote of the minority is informed." *MFW*, 88 A.3d at 645. When directors of a Delaware corporation seek stockholder action, they "are under a fiduciary duty to disclose fully and fairly all material information within the board's control." *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The essential question is whether there is a substantial likelihood that disclosure of the omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *TSC Indus.*, 426 U.S. at 449 (emphasis removed)). The disclosure standard does not require a "play-by-play description of every consideration or action taken by a Board." *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 511–12 (Del. Ch. 2010). "[R]equiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless." *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999).

Plaintiff alleges that the Proxy was false, misleading, or contained material omissions about four topics: (1) GSK's August 16 collaboration proposal; (2) GSK's capabilities; (3) the amount that GSK was willing to pay to acquire the minority shares of Eidos or the entire Company; and (4) GSK's willingness to consider transactions that did not require BridgeBio's approval.[141]

### 1. GSK's August 16 Proposal

Plaintiff alleges the stockholder vote was uninformed because the Proxy did not disclose the terms of GSK's August 16 collaboration proposal and because the disclosure concerning the Eidos Board's consideration of proposal "is not reconcilable with the documentary record."[142] According to the Proxy:

> On August 16, 2020, a large international pharmaceuticals company, Company C, delivered a proposal to Eidos management with respect to a potential licensing and collaboration transaction between Eidos and Company C (the "August 16 collaboration proposal"). Eidos management shared the August 16 proposal with the Eidos board promptly thereafter.
> On August 18, 2020, the Eidos board held a videoconference meeting during which, among other things, the Eidos board discussed the August 16 collaboration proposal. Following such discussion, the Eidos board unanimously determined that the August 16 collaboration proposal was not in the best interests of Eidos and its stockholders and determined not to pursue the August 16 collaboration proposal. Dr. Kumar, on behalf of BridgeBio, informed the Eidos board that while no decision had been made, BridgeBio management was preliminarily

---

[141] Compl. ¶¶ 128–142.

[142] *Id.* ¶¶ 128–129; *see* Pl.'s Ans. Br. 32–33.

considering potential alternatives with respect to Eidos, including the possibility of proposing a potential transaction, . . . .[143]

Plaintiff argues that this disclosure is entirely inconsistent with the documents produced to it pursuant to its books and records demand because the proposal is not mentioned in the 97-page slide deck distributed to the directors in advance of the August 18 meeting or in the minutes of the meeting.[144]

First, there is no mystery about the omission of GSK's proposal from the board package. Those materials were distributed to the directors on August 14, 2020—two days before GSK delivered its proposal.[145] Second, the board was aware of the proposal prior to the Board meeting. Kumar circulated the proposal and GSK's forwarding email to the Eidos directors shortly after receiving it on August 16.[146] Kumar's email proposed that the board "can discuss on Tuesday," an unmistakable reference to the upcoming August 18 board meeting.[147] Although the board minutes do not reference the GSK proposal, they indicate that during an executive session "[a] variety of additional topics were discussed."[148] Viewing the facts in their totality, the absence of an express reference to the GSK proposal in the

---

[143] Proxy at 71–72.

[144] Pl.'s Ans. Br. 35.

[145] Defs.' Opening Br. 27; Defs.' Ex. 24.

[146] Defs.' Ex. 24.

[147] *Id.*

[148] Pl.'s Ex. B at 6.

board minutes does not support a reasonable inference that the Eidos Board did not consider the GSK collaboration proposal at the August 18 meeting.

The court encountered a similar situation in *In re GGP, Inc. Stockholder Litigation*, 2021 WL 2102326, at *27 (Del. Ch. May 25, 2021), *aff'd in part and rev'd in part on other grounds*, 282 A.3d 37 (Del. 2022). There, the proxy represented that certain presentations were made to the board and certain topics were discussed, but the board minutes did not mention discussion of these topics or presentations. *Id.* at *26–27. The court declined to categorize these discrepancies as "conflicts," observing that proxies, by definition, contain more information than meeting minutes. *Id.* at *27. As the court observed, there is no requirement that board minutes "be prepared to any specified level of particularity." *Id.* (citing *Feuer v. Redstone*, 2018 WL 1870074, at *14 n.146 (Del. Ch. Apr. 19, 2018)). The court concluded that any purported conflict was not material.

That is not to say that discrepancies between board materials and a proxy cannot create a reasonable inference that a proxy's disclosure or characterization of certain events was false or materially misleading. For instance, in *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009), the proxy disclosed that the board had carefully deliberated about an alternative transaction, while the plaintiff—a director who personally witnessed the events in the boardroom—alleged that the board actually voted "[w]ithout any discussion or deliberation." *Id.* at 699–701. In *In re Xura, Inc.*

*Stockholder Litigation*, 2018 WL 6498677, at \*4, \*12 (Del. Ch. Dec. 10, 2018), the allegations in the complaint were supported by discovery (including deposition testimony) from a related appraisal action that specifically contradicted statements in the proxy. For example, the proxy disclosed that a strategic committee was established to evaluate and negotiate the terms of a potential transaction, but discovery from the appraisal litigation showed that the committee never met with the counterparty, and did not take any formal action or keep minutes, while one purported special committee member testified at his deposition that he did not know he was supposed to have served on the committee or that it even existed. *Id*. Here, by contrast, the Complaint's allegations are not nearly as strong as those in the cases upon which Plaintiff relies.

Other allegations and undisputed facts undermine the Plaintiff's assertion that the Eidos Board did not consider the GSK collaboration proposal. It is undisputed that the proposal was circulated to the Board two days before August 18 meeting and that Kumar indicated it should be discussed. The board minutes mention other topics being discussed in an executive session. The Complaint does not support a reasonable inference that the Proxy falsely represented that the Board considered the GSK collaboration proposal at the August 18 meeting.

Plaintiff's related argument—that the omission of the terms of the August 16 proposal from the Proxy was material—also fails. The August 16 proposal had been

43

rejected by the full Eidos Board prior to the creation of the Special Committee. *See In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at *14 (Del. Ch. Oct. 12, 2016) (holding that a disclosure claim will be dismissed where it "boil[s] down to an argument that plaintiff disagreed with a Special Committee's decision not to pursue another acquisition proposal and that other stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee.") (quoting *City of Miami General Emps.' v. Comstock, 2016 WL 4464156*, at *15 (Del. Ch. Aug. 24, 2016), *aff'd sub nom. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Comstock*, 158 A.3d 885 (Del. 2017)). That fact was fully disclosed in the Proxy. "Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing." *Comstock*, 2016 WL 4464156, at *15. The Proxy also disclosed the Special Committee's responses to GSK's post-signing proposals.

Eidos stockholders were being asked to vote on the BridgeBio Merger Agreement. The terms of the transaction were fully disclosed. GSK's August 16 collaboration proposal was not a competing offer at the time stockholders considered whether to approve the Transaction. *See Crane*, 2017 WL 7053964, at *15 (holding that no disclosure claim was established by the failure to disclose different strategic alternatives that were not on the table at the time of the stockholder vote). The stockholders were entitled to be fully informed, but did not need to be "infinitely

informed" with every granular detail about the prior collaboration proposal. *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017).

By contrast, the Proxy disclosed, consistent with the Board's fiduciary duties, GSK's November and December 2020 proposals, including offers to acquire all shares of Eidos and the public minority shares. *See Crane*, 2017 WL 7053964, at *13 n.126 ("'Even after the merger agreement is signed a board may not, consistent with its fiduciary obligations to its shareholders, withhold information regarding a potentially more attractive competing offer." (quoting *Jewel Cos., Inc. v. Pay Less Drug Stores Nw., Inc.*, 741 F.2d 1555, 1564 (9th Cir. 1984))). Of particular note, the terms of the December 9 collaboration proposal, which contained more favorable terms for Eidos than the August 16 proposal, such as an upfront payment of $2.2 to $2.4 billion,[149] are fully disclosed in the Proxy.[150] More than four full pages of the Proxy are devoted to GSK's November and December proposals and the Special Committee's responses.[151] In addition, the January 12, 2021 Supplement included a description of further communications with GSK following the filing of the Amended S-4 on December 11, 2020. In light of the disclosure of GSK's more

---

[149] Proxy at 85.

[150] *Id.*

[151] *See* Proxy at 81–86.

recent proposals, disclosure of the terms of GSK's August collaboration proposal would not have "significantly altered the 'total mix' of information available" to stockholders when deciding how to vote on the merger. *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994).

## 2. GSK's Suitability as a Commercialization Partner

Plaintiff argues that the failure to identify GSK as "Company C" and the disclosure of BridgeBio's view as to GSK's capabilities as a collaboration partner are materially misleading or false. Plaintiff acknowledges that proxy references to unsuccessful bidders by an anonymous code name is typical.[152] Nevertheless, Plaintiff maintains that GSK's identity was "of unusual and highly material relevance for Eidos stockholders weighing the Transaction's merits."[153]

The Proxy describes Company C as "a large international pharmaceuticals company."[154] A reasonable stockholder reading the Proxy would recognize that Company C was not some fly-by-night operation incapable of delivering premium value to the minority stockholders. The Proxy disclosed the Special Committee's

---

[152] Pl.'s Ans. Br. 40; *see also* Supplement; Defs.' Ex. 16 ("Neither party may use the other party's or its Affiliate's names . . . or in any other way identify the other party without the other party's prior written consent."); *see Books-A-Million*, 2016 WL 5874974, at *2 (identifying third-party bidder as "Party Y," which is how it was identified in the proxy statement).

[153] Pl.'s Ans. Br. 40.

[154] Proxy at 71.

determination that Company C's November 23 acquisition proposal at $120 per share, "if consummated, would be more favorable from a financial point of view to the holders of Eidos common stock (other than BridgeBio and its subsidiaries) than the merger agreement."[155] Thus, even without identifying Company C as GSK, the Proxy effectively communicated to Eidos stockholders that Company C's proposals were not only *bona fide*, but were capable of delivering greater value to the minority public shares. "While conceivably it might have been helpful to [] stockholders to identify the compan[y] involved on an individual basis, such supplemental disclosures would not have significantly altered the total mix of information available to them." *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *13 (Del. Ch. June 30, 2014).

Relatedly, Plaintiff takes issue with the BridgeBio board's view of GSK. As the Proxy revealed:

> [T]he BridgeBio Board discussed Company C's lack of presence in cardiovascular and rare genetic diseases, and noted that Company C had not provided satisfactory answers during the December 9 meeting regarding its plans with respect to development, life cycle management, commercial rebating, commercial network design and pharmacy benefit issues for Medicare in connection with Company C's proposed collaboration. The BridgeBio board unanimously determined that the terms of the Company C collaboration proposal were not attractive and Company C was not a suitable collaboration partner for acoramidis.[156]

---

[155] *Id.* at 82.

[156] *Id.* at 85–86.

Plaintiff argues that this disclosure misrepresents GSK's capabilities and portrays GSK in a disparaging light such that a reasonable stockholder could not fairly evaluate an alternative transaction with GSK. Plaintiff contends that this was a partial disclosure, which ought to have been supplemented to provide an accurate, full, and fair characterization of GSK's capabilities. *See Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) (holding a partial misleading disclosure gives rise to a duty to provide stockholders with an accurate characterization of the partially disclosed information).

A reasonable stockholder viewing the Proxy as a whole would recognize that the views expressed about Company C's capabilities reflected the opinion of the BridgeBio board and only the BridgeBio board. *See Crane*, 2017 WL 7053964, at *18 ("When determining whether there has been a disclosure violation, a proxy statement should be read as a whole."). The disclosure is expressed as the BridgeBio board's opinion, not as a fact or as a view of the Special Committee. "[T]here is no allegation in the complaint[] that this statement of opinion was not honestly held, i.e., false. Therefore, the plaintiff[] cannot bring any claims based on this factual allegation." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *3 (Del. Ch. Aug. 26, 2005). Plaintiff has not alleged a material omission or misrepresentation as to this disclosure.

### 3. Potential Alternative Transactions with GSK

Plaintiff alleges the Proxy failed to inform Eidos stockholders that "GSK was willing to consider potential alternative transactions that could have been accomplished without BridgeBio's involvement or approval."[157] Plaintiff further complains that the Proxy "never expressly explains why the Special Committee terminated negotiations with GSK."[158]

The Proxy disclosed that GSK's November 30 letter included a potential commercial collaboration with Eidos.[159] The Proxy also disclosed that Kumar, as BridgeBio CEO, and a representative of GSK discussed, at GSK's request, the November 30 letter, and that GSK's representative asked whether BridgeBio would be willing to consider a commercial collaboration involving Eidos and GSK.[160] The Proxy also disclosed the terms of the collaboration proposal, which were presented during a December 9, 2020 videoconference.[161] Nothing in the description of the terms of that proposal indicate that BridgeBio's approval was required to enter into the agreement. Plaintiff's apparent argument that the Proxy was materially incomplete because it did not expressly state that the collaboration proposal did not

---

[157] Compl. ¶ 140.

[158] *Id.*

[159] Proxy at 84.

[160] *Id.* at 84–85.

[161] *Id.* at 85.

require BridgeBio's approval is misplaced. *See Cottle v. Standard Brands Paint Co.*, 1990 WL 34824, at *6 (Del. Ch. Mar. 22, 1990) ("The duty of complete candor cannot possibly mean that companies are required to disclose not only all material existing facts but also the absence of all other relevant facts.").

The Supplement also did not indicate that BridgeBio's approval was required to enter into a collaboration agreement. It did, however, explain that GSK had delivered a letter on December 11 stating that GSK had "determined not to submit a revised proposal, for now."[162] The Supplement also revealed that the Special Committee had determined that "Company C would need to revise its proposals to either propose a transaction that BridgeBio, in its capacity as majority stockholder of Eidos, was willing to approve or propose a transaction that would not require the approval of BridgeBio."[163] The committee then determined that "notwithstanding [GSK's December 11 letter], it was advisable to indicate [the Special Committee's] willingness to continue discussions with [GSK]."[164] GSK did not respond.

The Proxy and the Supplement did not represent that BridgeBio's approval was required to implement a collaboration proposal between GSK and Eidos. Nor do the disclosures reflect that the Special Committee had terminated discussions

---

[162] Supplement.

[163] *Id.*

[164] *Id.*

with GSK. Although GSK expressed surprise in its December 11 letter that the Special Committee did not further explore "an increased proposal" with governance provisions "that could have been granted without BridgeBio's participation," GSK never made such a proposal.[165] The Special Committee minutes and the January 12 Supplement reflect that the committee indicated a willingness to continue discussions with GSK, but GSK had not expressed any continued interest in a transaction with Eidos after the committee delivered its January 13 response.

The Company's disclosures concerning GSK's proposals were not false or materially misleading and did not contain material omissions. Eidos stockholders were faced with a binary choice. They could approve the Transaction on the terms proposed, or they could reject it, maintaining the status quo or prompting the Special Committee to return to the bargaining table. *See In re Dell Techs., Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *18 (Del. Ch. June 11, 2020) (observing that

---

[165] As further support for its argument that stockholders were not told that a collaboration agreement could be accomplished without BridgeBio's approval, Plaintiff points to a December 29, 2020 slide presentation that the Special Committee gave to Institutional Shareholder Services. One slide in the 28-page presentation stated that "[t]he third-party proposals are illusory and unable to be executed." Pl.'s Ans. Br. 46 (quoting Defs.' Ex. 37 at 16). This presentation was filed with the SEC on December 25, 2020 on Form 425. Plaintiff contends that this statement "would have misled stockholders into believing that all of GSK's proposals, including all proposals described in the Proxy, were subject to— and impossible without—BridgeBio's approval." Pl.'s Ans. Br. 46. This representation in one slide of a 28-page presentation does not render the stockholder vote uninformed. The slide deck distinguishes between GSK's acquisition proposals and the collaboration proposal, and when read in context, the slide on which the reference to proposals that are "illusory and unable to be executed" is directed to acquisition proposals.

if stockholders reject the special committee's initial work, "the committee must return to the bargaining table, continue to act in its fiduciary capacity, and seek to extract the best transaction available"). There is no dispute that stockholders were provided with detailed descriptions of GSK's November and December 2020 proposals and the Special Committee's responses. Further additional disclosure that GSK had expressed interest in a potential, unexpressed, revised proposal with possible governance provisions that did not require BridgeBio's approval would not have significantly altered the total mix of information made available to Eidos stockholders.

### 4. The Board Was Not Required to Disclose an Offer Price that GSK Never Delivered.

The Complaint alleges the Proxy should have disclosed the price that GSK was willing to pay to acquire the Company.[166] The Proxy disclosed that GSK provided a letter to Eidos on November 30, 2020 indicating that GSK remained interested in "acquiring all of the outstanding shares of Eidos common stock for more than the $120 per share of Eidos common stock indicated in [GSK's] November 23 . . . letter."[167] The Complaint alleges that a reasonable stockholder voting on the Transaction would have wanted to know how much more GSK would

---

[166] Compl. ¶¶ 136–39.

[167] Proxy at 84.

have been willing to pay. The fundamental flaw in Plaintiff's argument is that the board is only required to disclose "information within the board's control." *Stroud*, 606 A.2d at 84. There is no allegation that the Board or Special Committee knew how much GSK was willing to increase its $120 per share offer before GSK walked away. There is no disclosure claim here, and the Plaintiff concedes as much by not addressing it in its answering brief. *See MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *16 (Del. Ch. May 10, 2018) (treating claims not briefed as abandoned); *In re Novell, Inc., S'holder Litig.*, 2013 WL 322560, at *6 n.91 (Del. Ch. Jan. 3, 2013) ("The Plaintiffs do not address their claim . . . in their Omnibus Answering Brief, despite being challenged by the [Defendants' Brief]. That claim, thus has been abandoned.").

### G. The Stockholder Vote Was Not Coercive.

To satisfy *MFW*, the stockholder vote must be uncoerced. *MFW*, 88 A.3d at 645. "'Coercion is a loaded term," *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *4 (Del. Ch. May 31, 2017), and it applies in a variety of factual contexts. *See Dell*, 2020 WL 3096748, at *20–30 (discussing the various strands of coercion jurisprudence in Delaware case law). In the deal context, the inquiry focuses on whether the stockholders have been permitted to exercise their franchise free of undue external pressure created by the fiduciary that distracts them from the merits of the decision under consideration. *Williams v. Geier*, 671 A.2d 1368, 1382–

53

83 (Del. 1996). Thus, it is not enough for an offer to be "economically 'too good to resist'" to constitute wrongful coercion. *Ivanhoe P'rs v. Newmont Mining Corp.*, 533 A.2d 585, 605 (Del. Ch.), *aff'd*, 535 A.2d 1334 (Del. 1987). Rather, the vote must be structured in such a way that allows stockholders a "free choice between maintaining their current status [or] taking advantage of the new status offered by" the proposed deal. *Gen. Motors*, 734 A.2d at 621. "The status quo may be undesirable or unpleasant, but that fact does not render the transaction coercive." *Dell*, 2020 WL 3096748, at *25.

In *Dell*, Vice Chancellor Laster addressed the concept of coercion as applied to the cleansing effect of stockholder votes under *MFW* and *Corwin*, 125 A.3d at 304. The court built upon two earlier decisions of this court, one addressing "situational coercion" and the other "structural coercion." *Dell*, 2020 WL 3096748, at *25 (citing *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *16 (Del. Ch. Mar. 31, 2017), and *Liberty Broadband*, 2017 WL 2352152, at *2).

Plaintiff here advances a theory of situational coercion. It argues that BridgeBio's refusal to allow Eidos to pursue an alternative deal or collaboration agreement meant that a deal with BridgeBio was the only viable option, with the

54

remaining alternative being "a risky and suboptimal independent launch of acoramidis."[168]

Situational coercion arises when the status quo is so unattractive that it prevents a stockholder vote from operating as a clear endorsement of a transaction. *Saba Software*, 2017 WL 1201108, at *15–16. In *Saba*, the company's stock had been delisted from the NASDAQ after an accounting fraud had been exposed. *Id.* at *3. As part of a later settlement with the SEC, the company was required to file restated financials by a date certain. *Id.* If the company did not meet the deadline, its shares would be deregistered. *Id.* When the company announced it would not meet the deadline, its stock price dropped dramatically, after which a private equity firm offered to acquire the company for $9 per share, which was below the then-current trading price. *Id.* at *5. The board approved the sale at that price, and nine days later, after the company missed the deadline for restating its financials, the SEC deregistered the company's shares. *Id.* at *6. A majority of the outstanding shares then voted in favor of the transaction. *Id.*

In denying a motion to dismiss a subsequent stockholder action challenging the transaction, the court held that it was reasonably conceivable that the stockholder vote was coerced. *Id.* at *16. The court observed that the stockholders faced a

---

[168] Pl.'s Ans. Br. at 28.

situation that the board had created "as a consequence of its allegedly wrongful action and inaction," due to its financial fraud, inexplicable failure to restate financials, and the later inexplicable failure to meet the later deadline that it agreed to honor in the settlement with the SEC. *Id.* Thus, it was reasonably conceivable that the board created the circumstances under which the stockholders were "forced . . . to choose between a no-premium sale or holding potentially worthless stock." *Id.* As the court in *Dell* put it, *Saba* required that for a vote to have a cleansing effect, "the court must have confidence that the vote reflects an endorsement of the merits of the transaction, not just a preference for a marginally better alternative over an already bad situation." *Dell*, 2020 WL 3096748, at *27.

In *Liberty Broadband*, the court held that a complaint alleging a stockholder vote did not cleanse a complex transaction containing four components stated a claim for relief where the vote was structurally coercive. 2017 WL 2352152, at *24. Two of the transaction's components were beneficial to the stockholders, while two other components conferred unique benefits on the company's largest stockholder, Liberty Broadband Corporation ("Liberty Broadband"). *Id.* at *13. The transactions were cross-conditioned, such that the two components that were beneficial to stockholders also required the stockholders to approve the two components that conferred separate benefits on Liberty Broadband. *Id.* at *22. The court declined to afford the stockholder vote the benefit of *Corwin* cleansing. *Id.* at *24. The court

held that it was reasonably conceivable that the defendants had first obtained the two transactions that were beneficial to the stockholders and then "used the value of those transactions to obtain a favorable vote on [the other two] extrinsic transactions, . . . [which] transferred wealth and voting power to Liberty Broadband at stockholder expense." *Id*. The court concluded the cross-conditioned votes were structurally coercive and thus it could not accept that the stockholder vote on the components that favored Liberty Broadband "was an informed ratification of that transaction." *Id*. at \*15.

In *Dell*, the controlling stockholder had agreed to condition its offer to negotiate a redemption of a class of common stock on compliance with *MFW*, but reserved the right to force the conversion those shares under the terms of the certificate of incorporation. 2020 WL 3096748, at \*16. In denying *MFW* cleansing, the court concluded that the company's disclosures regarding its potential exercise of its conversion right "constituted improper threats that resulted in coercion." *Id*. at \*32.

Eidos stockholders were not coerced into approving the Transaction because they had other acceptable alternatives to a deal with BridgeBio. Unlike Saba Software, Inc., Eidos was not a financially distressed company, whose stock had just been deregistered by the SEC and stockholders were being offered per share consideration "well below its average trading price." *See Saba Software*, 2017 WL

1201108, at *1. Rather, the Transaction with BridgeBio presented a premium offer to Eidos stockholders, who faced no threat of delisting. Eidos was nearing the end of the development process for a potentially profitable pharmaceutical product, AG10. As the Complaint discusses, the most attractive options for development-stage companies are generally to sell the company or to enter a licensing or collaboration agreement with a larger pharmaceutical company possessing the resources to launch and commercialize the product.[169] But this was not the only option available to Eidos. Eidos stockholders may also have chosen to go it alone. Although the launch of a pharmaceutical product by a first-time launcher is a complex and risky process, it is possible. Additionally, alternatives to the purchase by BridgeBio were apparent to the stockholders. The Proxy discusses the collaboration proposal put forth by GSK on December 9, which would require no permission or approval by BridgeBio.[170] Despite BridgeBio's refusal to sell its shares, which effectively blocked another acquirer from purchasing a majority of the Company, realistic alternatives existed in the absence of approval of the Transaction. Accordingly, the vote of the minority stockholders was informed and uncoerced.[171]

---

[169] Compl. ¶ 46.

[170] Proxy at 85.

[171] *See* Eidos Therapeutics, Inc., Current Report (Form 8-K) (Jan. 20, 2021) (reflecting that approximately 80% of all outstanding minority shares and more than 99% of the shares present voted in favor of the Transaction).

### H. Operation of the Business Judgment Rule

Plaintiff has failed to plead facts to refute the application of the *MFW* framework. Therefore, the business judgment rule applies to the Transaction. Where *MFW* applies, "a version of the business judgment rule applies under which the only remaining claim is one for waste." *Dell*, 2020 WL 3096748, at *14. Plaintiff has neither pleaded a claim for waste, nor made any effort to overcome the business judgment rule. The Complaint must be dismissed.

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is GRANTED, and the Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**